**David K. DUNAWAY, Plaintiff,**

v.

**William H. WEBSTER, et al.,
Defendants.**

**No. C–77–0907 RFP.**

United States District Court,
N. D. California,

July 9, 1981.

Steven L. Mayer, San Francisco, Cal., for plaintiff David K. Dunaway.

G. William Hunter, U. S. Atty., William T. McGivern, Jr., Asst. U. S. Atty., San Francisco, Cal., for defendant William H. Webster.

PECKHAM, Chief Judge.

This action, whose origins date back over five years, has become, to paraphrase another judge's characterization of an earlier case, a Frankenstein monster posing as a suit under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"). *See Eisen v. Carlisle and Jaquelin*, 391 F.2d 555, 572 (2d Cir. 1968). This court has now reviewed almost 350 documents *in camera* to consider if the various exemptions claimed by the government were proper. Having waded through this mass of documents and claims of exemption, we well understand why courts have generally avoided the quagmire of *in camera* inspections under the FOIA, particularly where a large number of documents are at issue. *See Fensterwald v. United States Central Intelligence Agency*, 443 F.Supp. 667, 669 (D.D.C.1977). It is the court's hope that the rulings made today will be used by the parties as a guide to resolving the remaining disputes over the exemptions claimed in the documents which were not inspected *in camera*. *Id*.

David Dunaway wrote to the Federal Bureau of Investigation ("FBI") on May 23, 1976, requesting all materials in the FBI's files concerning The Almanac Singers, a musical group which performed from 1940 until 1945; The Weavers, a musical group which performed nationally from 1949 until 1962; People's Songs, Inc., an organization of songwriters which published the *People's Songs Bulletin* from 1946 until 1950; and People's Artist, an organization of musicians which existed from 1945 until 1952.[1] After a series of communications between Mr. Dunaway, the FBI, and other government agencies, which were the originating agencies for some of the relevant documents, some of the documents in the files were released in full, some were released in part, and some were withheld in their entirety.

This action was filed on May 4, 1977. On October 13, 1977, the parties stipulated to an order entered by Judge Poole,[2] referring the matter to a magistrate for *in camera* inspection of some of the documents which were withheld entirely or in part. To make such an examination manageable, the parties agreed that the plaintiff would select a portion of the documents to be actually inspected by the magistrate. The parties apparently presumed that the magistrate's decision would allow them then easily to apply its guidelines to the remaining documents to determine if any further material from the other documents should be released. The plaintiff selected approximately 340 documents to be examined.

After a long period of delay, most of which was attributable to the continuing failure of the government to turn over the relevant documents, the magistrate issued preliminary findings in October 1979, upholding the claimed exemptions in their entirety. Those findings were made final on January 30, 1980.

▬ This matter then returned to this court, in accordance with the prior stipulation.[3] The court issued an order on June 25, 1980, requiring the government to submit proposed findings of fact which would provide the substantiation for the claimed exemptions which had not been provided either by the original affidavits filed by the government, or, unfortunately, by the findings of the magistrate. This court stated in that order that it felt it could not rule on the basis of the record before it, unless it was willing to do so as a matter of faith. Not only would it not do so, but it could not do so under the law. Since the FOIA clearly places the burden of proof on the government, 5 U.S.C. § 552(a)(4)(B), the court or-

1. Mr. Dunaway, a writer and graduate student at the University of California at Berkeley, made this request in connection with a book he is writing about Pete Seeger, the folksinger. Mr. Seeger was associated with each of these musical groups and organizations.

2. This matter was originally heard before Judge Cecil Poole. By the time the magistrate had

issued his findings and the case returned to the docket of the district court, Judge Poole had been appointed to the Ninth Circuit Court of Appeals. This case was therefore reassigned.

3. The case first came before this court after the report by the magistrate. *See* note 2, *supra*.

dered the government to produce evidence sufficient to carry that burden. *Church of Scientology of California v. U. S. Department of the Army*, 611 F.2d 738, 742–43 (9th Cir. 1979) (*in camera* inspection is not a substitute for government's burden of proof). In response, the defendants simply (1) referred the court to the affidavits which they had already submitted and which the court had already indicated were inadequate, and (2) repeated their recitation of conclusory findings which tracked the language of the statute.

Because of the continued failure of the government to meet its burden of proof, this court on August 4, 1980 ordered that the documents be released in their entirety.

The government moved for reconsideration of this order. In its papers, the government finally indicated that it was ready to meet at least one of the court's requests, that it submit a unified affidavit, as per *Founding Church of Scientology of Washington, D. C. v. Bell*, 603 F.2d 945, 948–49 (D.C.Cir.1979). There was no assurance provided, however, that the government could provide more particularized justifications for its claims. In fact, the affidavit of Special Agent Price, submitted with the government's moving papers, made it very clear that the government had no intention of providing any further justifications for those deletions made pursuant to 5 U.S.C. § 552(b)(1).[4]

Despite the inadequacies of the government's showing, the court decided to grant the motion for reconsideration. A great number of documents were at issue, the release of many of which it was claimed would damage national security and breach assurances of confidentiality made to third parties. The court also recognized that the inspection of the documents by the magistrate had been agreed to by both the parties and by the court itself. The magistrate had upheld the deletions in their entirety. Despite the inadequacy of his report, the

agreement of the parties and the court to the *in camera* inspection and the outcome of that inspection put the matter in a different posture than if the court was considering the issue on a clean slate. The court also felt that an *in camera* examination of the documents might well result in a speedier final disposition of this matter than would forcing the circuit court to review an order releasing the documents *in toto* because of the inadequate record.

The court therefore agreed on October 3, 1980 to examine the 340 documents *in camera*. The court began immediately to examine the 143 documents for which claims of exemption under 5 U.S.C. § 552(b)(1) had been made, since the government was not willing to come forward with any further justification for its claims as to those documents. The other 197 documents were submitted to the court for examination 30 days later. The 30-day delay was designed to give the government yet another chance to file a unified affidavit which would provide the necessary justifications for its assertions as to those documents. The affidavit filed on November 3, 1980 by Special Agent David S. Byerly was still inadequate in some respects. Some of those inadequacies were overcome by the *in camera* inspection. Those gaps in the government's presentation not filled by the examination of the documents result today in rulings against the defendants. After over four years of litigation, numerous opportunities to amend the record, and repeated admonishment by the court that the government had failed to meet its burden of proof, justice demands that the plaintiff finally prevail as to those claims of exemption which remain unjustified. To second guess the government's arguments or to give the government any further opportunity to provide adequate justifications would make a mockery of the provisions of the FOIA which place the burden of proof on the government and

---

4. Price Affidavit, filed August 22, 1980, at ¶ 9. 5 U.S.C. § 552(b)(1) exempts from disclosure all documents

 (A) specifically authorized under criteria established by an Executive order to be kept

secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order. . . .

which provide for a speedy judicial resolution of disputes under the Act, 5 U.S.C. § 552(a)(4)(D).

██ On the other hand, the court felt a great obligation to be particularly sensitive to the rights of third parties who are unrepresented in this action and yet who have a great stake in the disclosure or nondisclosure of much of the material at issue. This case is not like many requests under FOIA, where the material being requested concerns either the individual making the request, or some government project which only incidentally might touch on information provided by or concerning private individuals. *E. g., Hayden v. National Security Agency,* 608 F.2d 1381 (D.C.Cir.1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980); *Hardy v. Bureau of Alcohol, Tobacco, and Firearms,* 631 F.2d 653 (9th Cir. 1980). Here, much of the information concerns private persons who may or may not wish the information about them to be made public. In this context, the court had to be concerned that the interests of these individuals not be ridden over roughshod because of the government's dilatory tactics.[5]

With this in mind, we will now turn to a discussion of the claimed exemptions. The sheer volume of claims of exemption even in just those documents examined *in camera* prevent a detailed discussion as to every single claim. Instead, this opinion will discuss in general terms the categories of claimed exemptions and the type of documents for which they were claimed. The discussion will indicate how the court viewed such claims as applied to those particular types of documents. The appendix of this opinion then will go through all the deletions one by one and indicate summarily the court's ruling—either upholding the

claim, denying it, or upholding it in part and denying it in part.

In considering all of the claimed exemptions, the court has been guided by the fact that it is to consider the application of the exemptions *de novo,* and that the burden of proof remains on the government. 5 U.S.C. § 552(a)(4)(B); *Hayden v. National Security Agency, supra,* 608 F.2d at 1384.

**A. 5 U.S.C. § 552(b)(1)**

██ The 1974 amendments to the FOIA made it clear that this court is to make a *de novo* review of claims of exemption under subsection (b)(1), just as with claims under any of the exemptions in the statute; the court, however, is to accord "substantial weight" to the affidavits submitted by an agency in support of the assertion of this exemption. Senate Report 93–1200, 93rd Cong., 2nd Sess., at 12 (1974), *reprinted in* [1974] U.S.Code Cong. & Admin.News 6285, 6290; *Ray v. Turner,* 587 F.2d 1187, 1190–95 (D.C.Cir.1978); *Weissman v. Central Intelligence Agency,* 565 F.2d 692, 697 n.10 (D.C. Cir.1977). While this court is not simply to substitute its judgment for that of the classifying agency, we cannot blindly accept the conclusory assertions of the government which are not properly supported by the evidence. *Alfred A. Knopf, Inc. v. Colby,* 509 F.2d 1362, 1367 (4th Cir.) (FOIA now clearly provides for judicial review of propriety classification), *cert. denied,* 421 U.S. 908, 95 S.Ct. 1555, 43 L.Ed.2d 772 (1975).

5 U.S.C. § 552(b)(1) states that the agency may exempt materials which are

(1)(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order; ...

---

5. This is not the first time that the government's dilatory tactics have reached a point where the courts have felt an obligation to admonish the government for its behavior. *See Founding Church of Scientology of Washington, D. C. v. Miller,* 490 F.Supp. 144, 146 n.1, 150 (D.D.C.1980); *Irons v. Bell,* 596 F.2d 468, 470 (1st Cir. 1979) (FBI moved "with glacial celerity"). The government may well feel that by making these FOIA proceedings as lengthy

and costly as possible, it will discourage others from pursuing their rights under the Act, even in those cases where the plaintiff ultimately prevails in whole or in part. Not only is this a dangerous litigation strategy, but one which is inappropriate to a coordinate branch of the federal government, whose interest will be served by the equitable and fair enforcement of all the laws.

The documents in question were originally classified under Executive Order 11652, 3 CFR 375 (1973) (superceded) and earlier Executive Orders [6] which have established criteria for various classification designations. During the course of this litigation, however, Executive Order 12065, 3 CFR 190 (1979), took effect, and all of the documents claimed to be properly classified by the government were re-evaluated under the standards of the new order. This was the cause, in fact, of part of the delay in the magistrate's *in camera* inspection. As a result of this review, a handful of the documents were found to be no longer properly classified and were released to the plaintiff. *See* Affidavits of Jerry M. Graves, filed May 30, 1979 and September 4, 1979. The court, therefore, should consider whether the remaining documents are classified properly under the standards of Executive Order 12065. *Baez v. United States Department of Justice*, 647 F.2d 1328 at 1333–1334 (D.C.Cir.1980); *Lesar v. United States Department of Justice*, 636 F.2d 472, 479–81 (D.C.Cir.1980).

The vast majority of the classified documents which have been inspected by the court are designated "confidential." Under Executive Order 12065, this designation is to apply to information "the unauthorized disclosure of which reasonably could be expected to cause identifiable damage to the national security." § 1–104, 3 CFR at 191 (1979). A few of the documents are designated "secret," which is to apply to information, "the unauthorized disclosure of which reasonably could be expected to cause serious damage to the national security." § 1–103, 3 CFR at 191 (1979).

Section 1–3 of Executive Order 12065, 3 CFR at 193 (1979), establishes the criteria to be applied in determining the propriety of classification. It states:

1–301. Information may not be considered for classification unless it concerns:

(a) military plans, weapons, or operations;

(b) foreign government information;

(c) intelligence activities, sources or methods;

(d) foreign relations or foreign activities of the United States;

(e) scientific, technological, or economic matters relating to the national security;

(f) United States Government programs for safeguarding nuclear materials or facilities; or

(g) other categories of information which are related to national security and which require protection against unauthorized disclosure as determined by the President, by a person designated by the President pursuant to Section 1–201, or by an agency head.

1–302. Even though information is determined to concern one or more of the criteria in Section 1–301, it may not be classified unless an original classification authority also determines that its unauthorized disclosure reasonably could be expected to cause at least identifiable damage to the national security.

The court faced a great difficulty in examining these documents to determine whether the government has complied with this standard because the defendants never indicated to this court to which of these categories delineated in Executive Order 12065 any particular document or portion of a document belonged. Instead, they repeatedly presented this court with affidavits which spoke in a general way about the harms which would result from the release of these documents. For instance, the affidavit of Special Agent Byron L. Price, dated August 19, 1980 (attached as Exhibit A to Defendants' Motion for Reconsideration), simply stated that the documents had been reviewed in accordance with the Executive Order and that "[a]mong the harms perceived are revelation of the identities of national security sources and information furnished by foreign sources, disclosure of

---

**6.** See Executive Orders revoked by Executive Order 11653, listed in section 14 of that Executive Order, 3 C.F.R. at 386 (1973) (superceded).

lawful investigative methods and techniques, and, possibly, an adverse impact on the foreign relations of the United States." Price Affidavit at ¶ 9.

■ Despite the obligation of the government to present all necessary information in a single unified affidavit, *Founding Church of Scientology at Washington D. C. v. Bell, supra,* 603 F.2d at 948–49, this court in an effort to discover if the necessary information was ever provided, went back through the record. However, we could discover no such explanation under the criteria set out in Executive Order 12065 beyond the generalizations already indicated.[7] The affidavit submitted by Special Agent David S. Byerly, filed September 21, 1979, goes through the documents item-by-item, but it only indicates that the exemptions are claimed under (b)(1) "to protect classified information." In the main body of the affidavit, Agent Byerly simply refers to an earlier affidavit filed by Special Agent Jerry M. Graves, dated August 31, 1980. That affidavit, however, simply stated that the Department Review Committee had decided to declassify some portions of five documents, and that the remaining documents continued to be properly classified under Executive Order 12065. Graves stated that, for that reason, no new markings were being placed on the documents.

The court, therefore, was put in the position of having to decipher the basis of the government's claims by examining the markings on each document which referred to the standards and classifications established in Executive Order 11652. The only clue to how the documents fit into the standards established by section 1–301 of Executive Order 12065 was provided by the markings which indicated why the documents in question were considered exempt from the "General Declassification Schedule" ("GDS") established by Executive Order 11652, which schedule required documents not considered exempt to be declassified after six years. Most markings on the documents inspected by the court indicated that the documents were considered exempt from the GDS because they fit into the category of "[c]lassified information or material specifically covered by statute, or pertaining to cryptography, or disclosing intelligence sources or methods." § 5(B)(2), Executive Order 11652, 3 CFR at 381 (1973). A few of the documents were considered "[c]lassified information or material furnished by foreign governments or international organizations and held by the United States on the understanding that it be kept in confidence," § 5(B)(1), 3 CFR at 381 (1973), and a few of the documents allegedly fell into the category of "[c]lassified information or material disclosing a system, plan, installation, project or specific foreign relations matter the continuing protection of which is essential to the national security." § 5(B)(3), 3 CFR at 381 (1973).

Unfortunately, these markings apply generally to the documents so marked; they do not indicate if the claim applies to all the classified segments of the document, or only to some of them. This distinction is important because while the Executive Orders allow an entire document to be initially classified according to the highest classification category of any one segment of the document, the agency is required to release any "reasonably segregable portion" of a document so classified "that no longer requires protection" when a request is made under the FOIA to declassify and release information. §§ 3–501, 3–502, E.O. 12065, 3 CFR at 198 (1979).

The generalized, conclusory nature of the government's affidavits is particularly inadequate in light of the clear policy favoring declassification enunciated in Executive Order 12065. The entire contents of the Executive Order are geared to implement its declaration that "[d]eclassification of classified information shall be given emphasis

7. The Affidavit of Special Agent Shea, filed July 17, 1978, did recite the reasons why particular documents were exempt from the General Declassification Schedule under Executive Order 11652. As discussed in the text, *infra,* these categories are similar to, but not exactly duplicative of, those which are listed in § 1–301 of Executive Order 12065. They also served a different function under the earlier Executive Order.

comparable to that accorded classification." § 3–301, E.O. 12065, 3 CFR at 197 (1979). Of particular interest to this court is the Executive Order's statement that even information properly classified under the standards set out in § 3–1 of the Executive Order should be released, if "the public interest in disclosure outweighs the damage to national security that might reasonably be expected from disclosure." § 3–303, E.O. 12065, 3 CFR at 197 (1979). The simple statements by Special Agent Graves reciting the standards of Executive Order 12065 in a conclusory manner without further elucidation[8] do not provide much assurance to the court that these classification decisions were carefully and individually reconsidered in light of the new Executive Order, with its heightened emphasis on declassification of documents, particularly documents which are as old as are most of the documents in question here.

Most of these documents are at least 20 years old, and many of them are more than 30 years old. The entire focus of Executive Order 12065, and, for that matter, its predessessor, Executive Order 11652, is on declassification of documents of such age. For newly classified documents under Executive Order 12065, no document may be classified for more than 20 years without at least a date set for review, except foreign government information, which may be kept classified without review for a period up to 30 years. The order allows only some of those persons with general classification authority to classify any document for more than six years, and it admonishes those who are given this authority to use it only "sparingly." § 1–402, 3 CFR at 193 (1979). Section 3–402 of the order, 3 CFR at 197–98 (1979), provides that agency heads are to establish an automatic review procedure for all documents over 20 years old which were already classified at the time of the issuance of the new order, and that except for "specific, limited categories of information which, because of their national security sensitivity, should not be declassified au-

tomatically," and a few specified categories, including foreign government information, all such documents shall be declassified automatically after 20 years, even if, as is the case with these documents, no automatic declassification date had been previously established. Other sections of the order[9] indicate that the presumption is that most classified material will be declassifiable after 20 years, and that any material kept classified for longer periods is subject to particularly close scrutiny.

In light of the clear policy embodied in Executive Order 12065, the failure of the defendants in this action to provide any explanation beyond conclusory statements of the decision to continue classification of these documents is very telling. So is the failure of the government to submit any affidavits detailing the considerations brought to bear in the review of the vast majority of the documents, which were more than 20 years old, by the Department Review Committee, or, for that matter, even to provide an affidavit from any member of the Department Review Committee. *See* Affidavit of Jerry M. Graves, filed September 4, 1979. It is the opinion of this court that the defendants could well have provided some explanation of the decision to continue to classify these documents, in the face of the strong policy favoring declassification of documents of this age, without risking disclosure of the information they were trying to conceal. The failure to do so has meant that even giving the government's affidavits the "substantial weight" they deserve under the law, the conclusory assertions contained therein do little to guide this court in evaluating the reasonableness of continued classification. *See Coastal States Gas Corp. v. Department of Energy,* 617 F.2d 854, 861 (D.C.Cir.1980) (burden is on agency to establish right to withhold information and "they must supply the court with sufficient information to allow us to make a reasoned determination that they are correct.")

---

**8.** *See* Graves Affidavits, cited *supra* at p. 1067.

**9.** *See, e. g.,* § 3–401, 3 C.F.R. at 197 (1979).

The *in camera* inspection by the court has done little, in most instances, to dispel the court's doubts. Most of the information concerns the comings and goings of United States citizens 20 to 30 years ago, as well as the accumulation of general information on the activities of various organizations in this country which were considered subversive at that time. Virtually all of the information is of the most mundane character, information which has no apparent relationship to the security of this nation today, if it ever had. While the disclosure of the information might reveal the use of some intelligence methods, there is no revelation in any of these documents of methods of investigation which would not leap to the mind of the simplest-minded intelligence agency. The type of information and sources revealed in the documents are such that this court has no reason to believe that they continue to be sources of information for the government. Many of the organizations spied on are defunct, many are no longer considered a security risk, and many of the individuals involved are dead. Without some evidence from the government that would suggest to this court that the sources revealed in these documents are of continuing use to the United States for national security purposes, this court cannot find any basis for believing that this information, if disclosed, could reasonably be expected to have any identifiable damage on our national security. No such evidence has been forthcoming from the government, despite repeated opportunities to place it in the record.

 We note, moreover, that the government cannot rely on a general claim that *any* disclosure at *any* time of an intelligence source would damage national security. There is no suggestion in Executive Order 12065 of such blanket protection of the identities of intelligence sources; they are listed just as any other category of information which is potentially classifiable, which only may be so classified if damage might be caused to our national security. There is no suggestion anywhere in the

Executive Order that any exception to the general emphasis on declassification is made for the identities of intelligence sources. Any such exception—for the identities of sources of information and any information which might identify the source—would have such broad effect on the general policy that it is impossible for this court to believe that the President meant for such an exception to be implied without ever explicitly stating it in the Executive Order. Yet, to argue that to release information identifying intelligence sources of 20 or 30 years ago will have an adverse effect on our ability to get information from present sources would be to establish just such broad exception. This court is not willing to travel that path. There must first be some evidence that the disclosure of information which might lead to the identification of a source of information will have some reasonably identifiable damage to national security. In this case, the information is very old, there is no evidence that any of the organizations or individuals are of continuing threat to our national security, or, even if some of the organizations are still so considered, there is no evidence that the FBI still relies upon the same sources or the same specific method of obtaining information. The government has made no such representations, and nothing in this court's *in camera* inspection of the documents leads it to believe that any threat within the criteria of Executive Order 12065 would exist from the release of the vast majority of the information. To the contrary, most of the information is innocuous to the extreme, and much of it is similar or even identical in nature to the information found in the other documents inspected by this court for which no claim of classification has been made.

Additional doubts were instilled during the court's *in camera* inspection by the discovery of some segments of the documents which were being claimed as exempt under 5 U.S.C. § 552(b)(1) which had been designated "unclassified" under Executive Order 11652.[10] There was no indication, either on

---

**10.** Under Executive Order 11652, documents were to be marked to show which portions

were classified and at what level. § 4(A). All of the documents inspected *in camera* were so

the documents themselves or in any affidavit submitted to this court, that there was any reason for now classifying any material in these documents which had not originally been classified by the government under Executive Order 11652. These segments were found despite the assurance in the Affidavit of Jerry M. Graves, filed May 30, 1979, at paragraph 9, that "[t]he classified items were also reviewed to identify any reasonably segregable portion that could be declassified, and none were found."

Despite a great reluctance on the part of this court to appear to substitute its judgment for that of the FBI, it is clearly our duty under the law to evaluate the claims made in invoking 5 U.S.C. § 552(b)(1). *Ray v. Turner, supra*, 587 F.2d at 1193–94. In this case, the court has found those assertions so lacking in substance and foundation that, in most cases, we have rejected the claims of exemption. As a general matter, the court has upheld the claim of exemption under (b)(1) only for information obtained from a foreign government, or information obtained in the process of surveillance of representatives of foreign nations. Information of this sort could reasonably be expected to cause damage to the national security if it was established on the public record that the United States has this information or engaged in these activities. Most of the information, however, did not fit these categories. The rest of the information, concerning the surveillance of individuals and groups within this country 20 to 30 years ago, is precisely the type of information which this court believes that Executive Order 12065 was not meant to protect. Absent any reasonable explanation from the defendant of why this information should remain classified, this court must, under the law, reject the assertion of 5

U.S.C. § 552(b)(1) as an exemption to the duty to disclose the information under the FOIA. *Weberman v. National Security Agency*, 490 F.Supp. 9, 13–14 (S.D.N.Y. 1980). It must also reject that claim as to incidental information and reasonably segregable portions of these documents which were clearly never subject to classification, but only initially classified because the entire document was classifiable according to the highest classification of any segment of the document. In the face of the directive both in the FOIA [11] and in Executive Order 12065 [12] to release such segregable portions of the documents, this court must now reject any further assertion of the (b)(1) exemption as to those segments.

However, this does not mean that the court is ready to release all of this material to the plaintiff. Among the other failings of the defendants in this case, they have not raised alternative claims of exemption for any of the material for which a claim of exemption under (b)(1) was made. Either they were overly confident of their position on those claims, or they had the mistaken impression that, after over four years of litigation, this court would be prepared to listen to new claims of exemption raised after its ruling on the (b)(1) claims. Such a cavalier attitude by the government has marked all of its behavior in this litigation, and is apparently not uncommon in litigation under the FOIA. [13] The government should be on notice, however, that it is no more entitled to two or three "bites at the apple" than any other litigant. *See Coastal States Gas Corp. v. Department of Energy*, 495 F.Supp. 1172, 1176 (D.Del. 1980), *vacated on other grounds*, 644 F.2d 969 (3d Cir. 1981). It should be prepared to raise all claims under the FOIA in the alternative at the initial stage of the proceed-

---

marked, with portions marked "U," "C," or "S," presumably referring to "unclassified," "classified," or "secret." The document was then given an overall classification at least as high as its highest classified component. 28 C.F.R. § 17.17 (1973). This court found instances where segments of documents marked with a "U" were being withheld under an assertion of the (b)(1) exemption, without any fur-

ther explanation, despite the fact that they were clearly reasonably segregable.

**11.** 5 U.S.C. § 552(b).

**12.** § 3–501, 3 C.F.R. at 198 (1979).

**13.** *See* note 5, *supra*.

ings, so that the plaintiff may respond and the court rule in the most expeditious manner. If it fails to do so, it should be prepared to stand or fall on the strength of only those assertions made at the proper time. *Id.*

In this case, however, the court is reluctant to rule in a manner which would essentially make third parties unwittingly pay for the failure of the government to protect adequately their interests under the law. Much of this material, if disclosed, would reveal the names of third parties who were of investigative interest to the FBI for allegedly subversive activities. It would place in the public domain details of their personal lives as well as rumors and allegations about what they did or did not do or say or believe. Such a release would also place in the public domain the names of persons who were informants for the FBI in the 1940s and 1950s, as well as information which would allow varying numbers of people to readily identify other informants.

This is information which may be properly withheld under exemption (b)(7) of the FOIA, as the discussion *infra* will indicate. The government has, in fact, withheld identical or similar information under claims of those exemptions in those documents where it was not making claims under (b)(1). There would be a certain tragic irony if this court were to release the very type of information for which it is upholding claims of exemption in some documents because of the unnecessary damage to third parties which would otherwise occur, simply because the government overreached itself in trying to protect that information in some cases with the assertion of the wrong exemption. *See Sims v. CIA*, 479 F.Supp. 84, 88 (D.D.C.1979) (allowing government the chance to assert new claims of exemptions, under (b)(1), after rejecting claims under (b)(3), in order to protect third parties).

The court does not feel it is obligated to follow that route. Unlike the more questionable assertion of "equity" jurisdiction to protect information which does not fall within any of the exemptions under FOIA, *see Theriault v. United States*, 503 F.2d 390,

392 (9th Cir. 1974); *Hardy v. Bureau of Alcohol, Tobacco, and Firearms*, 631 F.2d 653, 655, n.1 (9th Cir. 1980) (issue of equity jurisdiction to prevent disclosures undecided in this circuit); *Halperin v. Department of State*, 565 F.2d 699, 706–07 (D.C.Cir.1977), *cert. denied, sub nom. United States Broadcasting Company v. Federal Communications Commission*, 434 U.S. 1046, 98 S.Ct. 890, 54 L.Ed.2d 796 (1978) (instructing district court to use such equity jurisdiction only if information fits within standard set out for prior restraints in *Near v. Minnesota*, 283 U.S. 697, 716, 51 S.Ct. 625, 631, 75 L.Ed. 1357 (1931)); 1 O'Reilly, *Federal Information Disclosure*, § 8.05 (1979), the court here is only applying exemptions which are clearly part of the statutory scheme. Courts have, in the past, applied exemptions which were not explicitly raised by the government where there was sufficient factual basis for applying the exemption in the record. *E. g., Founding Church of Scientology of Washington, D. C. v. Miller*, 490 F.Supp. 144, 149 n.8 (D.D.C.1980); *Providence Journal Co. v. F.B.I.*, 460 F.Supp. 778, 792 (D.R.I.1978) (applying (b)(7)(F)); *Malloy v. United States Department of Justice*, 457 F.Supp. 543, 544–45 (D.D.C.1978), *rev'd on other grounds*, 602 F.2d 1010 (1st Cir. 1979), *cert. denied*, 444 U.S. 1071, 100 S.Ct. 1015, 62 L.Ed.2d 752 (1980) (applying exemption (b)(7)(E) where government had asserted exemption (b)(2)); *Lamont v. Department of Justice*, 475 F.Supp. 761, 780–81 (S.D.N.Y.1979) (applying exemption (b)(6)). In this case, the same exemptions have been claimed for the same sort of information in many of the other documents. The plaintiff has addressed these claims in his papers. He is not prejudiced, therefore, by this application of these other exemptions to this material. The court is simply applying these exemptions to this material as it is approving their application to the other material in the rulings discussed *infra*. Otherwise, either the interests of third parties, already poorly protected by the FOIA, will be sacrificed to form, or this case will be needlessly further delayed by an attempt by the government to raise these exemptions in a

motion to reconsider or in an argument to the court of appeals in support of a request for a remand. *See, e. g., Founding Church of Scientology v. Bell,* 603 F.2d 945, 951 (D.D.Cir.1979) (on remand, district court ordered to consider additional claims of exemption made by the government).[13a]

### B. *5 U.S.C. § 552(b)(2)*

█ The FBI has deleted certain symbol numbers and some other administrative markings under 5 U.S.C. § 552(b)(2), which exempts from disclosure matters that are "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). These are the type of routine housekeeping matters which were intended by Congress to be exempted by (b)(2), and do not appear to this court to be "substantial matters which might be the subject of legitimate public interest." *Vaughn v. Rosen,* 523 F.2d 1136, 1142, 1141–43 (D.C.Cir. 1975). Although the legislative history of this section leaves some doubt as to the reach of this exemption, *compare* Senate Report # 813, 89th Cong., 1st Sess., at 8 *with* House Report # 1497, 89th Cong., 2nd Sess., at 10, the court holds that these materials are not such that the public could reasonably be expected to have an interest in them, nor are they the type of material in any case which are subject to "a genuine and significant public interest." *Department of the Air Force v. Rose,* 425 U.S. 352, 369, 96 S.Ct. 1592, 1603, 48 L.Ed.2d 11 (1976). Therefore, this court holds that these materials were properly claimed to be exempt under the provisions of 5 U.S.C. § 552(b)(2). *See Founding Church of Scientology v. Miller, supra,* 490 F.Supp. at 146–47.

### C. *Congressional Documents*

█ A few of the documents were withheld by the FBI because they are documents which originated with the United States Congress. Defendants originally claimed that these documents were exempt under 552(b)(3), which allows material to be withheld which is "specifically exempted from disclosure by statute. . . ." The FBI has subsequently realized that the claim of this exemption in this situation was inappropriate, and the FBI now argues that these documents are not "agency records" within the meaning of the FOIA. 5 U.S.C. §§ 552(a)(3) and 552(a)(4)(B). The leading case which has discussed this issue is *Goland v. Central Intelligence Agency,* 607 F.2d 339 (D.C.Cir.1978), *vacated in part on other grounds,* 607 F.2d 367 (D.C.Cir.1979), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980) ("Goland"). In that case, the circuit court rejected any *per se* test which either labeled a document an "agency record" simply because it is found in the possession of any agency covered by the FOIA, or labeled a document exempt simply because it originated with Congress. Instead, the court stated that the crucial question is whether "the document has passed from the control of Congress and become property subject to the free disposition of the agency with which the document resides." 607 F.2d at 347. The crucial factors to be considered in deciding this question are "the circumstances attending the document's creation and the conditions under which it was transferred to the agency." *Holy Spirit Assoc. for the Unification of World Christianity v. C.I.A.,* 636 F.2d 838, 841 (D.C.Cir.1981) ("Holy Spirit").

In *Goland,* the court concluded that the document in question was still a Congressional document under the control of the House of Representatives. The court pointed to the fact that (1) the document was a transcript of a hearing held in executive session, and the transcript was marked "Secret," "plainly [evincing] a Congressional intent to maintain Congressional control over the document's confidentiality." *Goland, supra,* 607 F.2d at 387. The court also

---

**13a.** For the same reasons, the court has also allowed deletions to stand in some documents for which claims were asserted under (b)(7)(D) where the material was properly withheld under (b)(7)(C) or, in a few cases, under (b)(2), and some material claimed to be outside the scope of the request was found to have been properly deleted under exemptions (b)(2), (b)(7)(C), or (b)(7)(D).

relied heavily on the fact that the evidence clearly indicated that the C.I.A. retained possession of a copy of the transcript solely for internal reference purposes, to be used in conjunction with legislation concerning the Agency. *Id.*

In the *Holy Spirit* case, the court refused to find certain documents held by the C.I.A. concerning Korean-American relations to be "Congressional documents." Applying the test set out in *Goland,* the court found that there was no evidence that the documents in question were considered secret by Congress; the claim that they were created in the course of sensitive investigations was held not to be sufficient. Moreover, the court noted that there was no evidence that the 35 documents in question were transferred to the custody of the C.I.A. with any instructions or restrictions on their use. This was in contrast to other documents which were transferred to the custody of the C.I.A., which were accompanied by a memorandum from the House Committee in question asserting continued control of the documents by the Committee and limiting access to them. In these circumstances, the court felt there was no "clear assertion of congressional control" over the 35 documents in question, either in their creation or in their transfer. *Holy Spirit, supra,* 636 F.2d at 842.

■ With these cases to guide us, the court has examined the documents in question in this case to consider whether there is any evidence of "Congress' intent to retain control over the records or to preserve their secrecy." *Id.* Document 42, attached to the Lang Affidavit, clearly falls within the test of *Goland* and is properly withheld. In fact, the material in that document is very similar to that considered in *Goland* : transcripts of testimony taken in executive session by a Congressional committee and turned over to the FBI for purposes of limited review. The court therefore has upheld the agency's decision not to release this information.

■ The other documents, however, are not subject to this exemption. The cover memorandum accompanying a portion of

transcript from an executive session of the House Committee on UnAmerican Activities (document 41, attached to the Lang Affidavit) indicates that the transcript was "leaked" to the FBI by a source within the Committee. The distribution of the transcript within the FBI was not in any way limited and no restrictions were put on its use. Therefore, this court cannot consider this portion of the transcript to continue to be within the control of Congress, and therefore it will be released, subject to some deletions made to protect the privacy of third parties within the meaning of 5 U.S.C. § 552(b)(7)(C).

■ Nor should the material withheld in document 43, attached to the Lang Affidavit, be kept from the plaintiff. The first three pages of that document is not even part of the transcript obtained from the "McCarran Committee," but rather is a FBI memorandum. Whatever the propriety of invoking this claim for the transcript itself, there is no basis for calling this FBI memorandum a "Congressional document." The fact that it discusses testimony before a Congressional committee does not make it a Congressional document any more than an account in a newspaper of Congressional hearing can itself be called a Congressional document. *See Abramson v. F.B.I.,* No. 79–2500 (D.C.Cir., October 24, 1980) Slip op. at 12–16 (FOIA exemptions apply to documents themselves, not to information contained in those documents). Therefore, this material will be released, subject to deletions made to protect the privacy of third parties, under 5 U.S.C. § 552(b)(7)(C). The court is also allowing the deletion of information which would identify the person who testified, under 5 U.S.C. § 552(b)(7)(D). The person testifying in executive session before this committee of Congress did so, in the court's opinion, with an understanding that the fact that he was testifying would be kept confidential.

■ The court is also releasing portions of the one page of transcript attached to the memorandum, subject to the same deletions for privacy considerations. The mem-

orandum accompanying the portion of transcript indicates that the testimony in question was "released for any action necessary by the Bureau...." The memorandum indicates that the testimony was distributed widely within the FBI, with no limit put on the use of this testimony; it only cautioned agents not to report the witness's appearance before the committee or to indicate in any way that the FBI had actually seen this testimony. The free use of this testimony and wide dissemination it was to have within the agency, for whatever purpose the FBI wished, leads this court to conclude that the Congress had surrendered control over the transcript in question, and that therefore it does not qualify as a Congressional document. Under these circumstances, the one page of transcript should not be withheld on that ground.

■ The same exemption is claimed for document 57, attached to the Affidavit of Norbert H. Rascher ("Rascher Affidavit"). This claim must also be denied. The document is an excerpt from an executive session of the House Committee on UnAmerican Activities. There is no indication under what circumstances the FBI obtained this excerpt, or what use was to be made of it by the FBI. Absent any evidence that Congress retained control of this document or restricted its use within the FBI in any manner, this court finds that the document is an FBI record within the meaning of the FOIA. Therefore, the transcript segment will be released, subject to deletions made within the meaning of 5 U.S.C. § 552(b)(7)(C).

**D. 5 U.S.C. § 552(b)(7)(C)**

■ We now come to one of the two major categories of exemptions which have been asserted for these documents. Under 5 U.S.C. § 552(b)(7), documents may be withheld from disclosure under FOIA if they are

investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would ... (C) constitute an unwarranted invasion of personal privacy, (D) disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source, [or] (E) disclose investigative techniques and procedures....

The threshold question is whether the documents in question are "investigatory records compiled for law enforcement purposes...." For a law enforcement agency such as the FBI, there need only be established that there is a " 'rational nexus' between the enforcement of a federal law and the document for which an exemption is claimed." *Church of Scientology v. United States Department of the Army*, 611 F.2d 738, 748 (9th Cir. 1980), *quoting Irons v. Bell*, 596 F.2d 468, 472 (1st Cir. 1979).

■ The affidavits submitted with these documents assert that the "main" files [14] on the various organizations for which the FOIA request was made were compiled in connection with "internal security" investigations to determine whether the organization or any of its members were acting in violation of 18 U.S.C. § 2383 (rebellion or insurrection), § 2384 (seditious conspiracy) § 2385 (advocating the overthrow of the government), or, in some cases, the Internal Security Act of 1950. *See*, Affidavit of Patrick H. Lang ("Lang Affidavit"), filed March 15, 1978, at 14; Rascher Affidavit, filed March 15, 1978, at 15; Affidavit of Alan P. Hoyt ("Hoyt Affidavit"), filed March 15, 1978, at 18, 19. As for docu-

---

**14.** The general indices which the FBI uses to locate documents pertinent to a FOIA request makes two types of references to files. "Main" index references refer to files for which the subject of the request is the main subject of the file or document. The "see" references refer to files or documents which mention the subject of the request, but which are in the "main" files of some other person or organization. *See* Affidavit of David S. Byerly, filed November 3, 1980, at ¶ 11.

ments found in "see" reference files,[15] the affidavits submitted by the defendants simply assert that these documents were "investigatory records compiled for law enforcement purposes and were collected in the course of lawful national security investigations or other mandated investigations imposed by law." *See, e. g.,* Lang Affidavit, at 15; Rascher Affidavit, at 17; Affidavit of David S. Byerly, filed May 5, 1978, at 3; Hoyt Affidavit, at 20.

This is the full extent of the showing by the defendant of a "law enforcement purpose," a "criminal investigation" or a "lawful national security investigation." This court is prepared to accept this showing as sufficient to meet the threshold requirement of exemption 7. The holding of the court of appeals for this circuit in *Church of Scientology v. United States Department of the Army, supra,* suggests that an agency with a clear law enforcement purpose, as opposed to one with a mixed purpose which includes both administrative and law enforcement functions, need only be held to a minimal showing that the activity which generated the documents was related to the agency's function. 611 F.2d at 748; *see also Irons v. Bell, supra,* 596 F.2d at 472; *Kuehnert v. F.B.I.,* 620 F.2d 662, 666–67 (8th Cir. 1980); *Ramo v. Department of the Navy,* 487 F.Supp. 127, 130–32 (N.D.Cal. 1979). This minimal threshold showing makes sense when considered in conjunction with the further qualifications placed on the applicability of the second phrase of exemption 7(D), which concerns those circumstances in which all information provided by a confidential source may be withheld. If the qualification of the second phrase of exemption 7(D) ". . . in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, . . ." is not to be considered redundant, Congress must have

meant that the first test—"law enforcement purpose"—would only separate out materials which were either administrative or clearly outside the scope of authority of a law enforcement agency. Having inspected these documents *in camera,* the court is prepared to accept the government's assertion that these files were compiled for a "law enforcement purpose" within the meaning of exemption 7. *See Lamont v. Department of Justice,* 475 F.Supp. 761, 773 (S.D.N.Y.1979). The showing, however, is barely sufficient and is certainly not sufficient to allow the government to apply the second phrase of exemption 7(D) to these documents. *See, infra,* page 1080.

 Exemption 7(C), along with exemption 6,[16] are the only exemptions under the FOIA which require the court to engage in a balancing of considerations. The considerations which must be weighed have been formulated in a number of different ways, but amount to a consideration of the public's interest in disclosure versus the invasion of privacy which such a disclosure would entail. *See, e. g., Nix v. United States,* 572 F.2d 998, 1002–03 (4th Cir. 1978); *Rushford v. Civiletti,* 485 F.Supp. 477, 478 (D.D.C.1980); *Ramo v. Department of the Navy, supra,* 487 F.Supp. at 132. The defendants have invoked this exemption for a number of different types of information, each of which requires the court to strike this balance accordingly.

### Names of FBI Personnel

 With rare exception, the deletion of the names of FBI agents and other lower echelon government personnel has been upheld by the courts as proper under this exemption. *Nix v. United States, supra,* 572 F.2d at 1005–06; *Ferguson v. Kelly,* 455 F.Supp. 324, 327 (N.D.Ill.1978) (on reconsideration of earlier decision, 448 F.Supp. 919); *Lamont v. Department of Justice, supra,*

---

**15.** *See* note 14, *supra.*

**16.** Exemption 6 demands a showing of a more serious invasion of privacy than does exemption 7(C), in that exemption 6 protects only material which, if disclosed would cause a

"*clearly* unwarranted invasion of privacy" (emphasis added). *See Department of the Air Force v. Rose,* 425 U.S. 352, 378–79 n.16, 96 S.Ct. 1592, 1607 n.16, 48 L.Ed.2d 11 (1976).

475 F.Supp. at 777; *Founding Church of Scientology v. Miller, supra,* 490 F.Supp. at 147; *Malloy v. United States Department of Justice,* 457 F.Supp. 543, 546 (D.D.C. 1978); *Lesar v. United States Department of Justice,* 636 F.2d 472, 487–88 (D.C.Cir. 1980). While it may be true that persons who choose to serve as public officials have given up a right to privacy insofar as they engage in misconduct or questionable activities, we agree that they are not "thereby stripped of every vestige of personal privacy, even with respect to the discharge of [their] official duties." *Nix v. United States, supra,* 572 F.2d at 1006. On the one hand, we see little public interest in identifying the individual FBI agents who were associated in one way or another with the investigations which produced these documents. *Albin v. Internal Revenue Service,* 79–2 U.S.T.C. ¶ 9584 (D.D.C.1979) at 88, 123. There has been no assertion, nor is there any evidence in the record or in the documents which this court has examined, that any of these agents were involved in any improper activities such as would increase the public interest in knowing their identities. On the other hand, disclosure of their names, especially in connection with investigations which are now looked upon in many circles as ludicrous at best and worthy of condemnation, could result in harassment and annoyance. This court is in agreement with the Fourth Circuit's conclusion in another case that "[w]hile the right of privacy of these FBI agents is perhaps minimal, we find that the public interest in the identification of the FBI agents who conducted the investigation . . . to be even less." *Nix v. United States, supra,* 572 F.2d at 1006. *Accord, Ramo v. Department of the Navy, supra,* 487 F.Supp. at 132–33.

*FBI's Investigative Interest in Third Parties*

A great deal of information was deleted from the documents in question under a claim that its release would cause an unwarranted invasion of the privacy of third persons. Virtually all of this material either identified individuals who were of investigative interest to the FBI, or contains information linking those individuals to activities or organizations which at that time were considered subversive.

The court here is presented with a somewhat unusual, although not nearly unique, situation. In most FOIA cases in which the decisions are reported, the subject of the files or documents is the one making the request. *E.g., Irons v. Bell,* 596 F.2d 468 (1st Cir. 1979); *Hayden v. National Security Agency,* 608 F.2d 1381 (D.D.C. 1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980); *Thorstad v. C.I.A.,* 494 F.Supp. 500 (S.D.N.Y.1979); *Lamont v. Department of Justice, supra.* In those cases, there is little problem with the issue of privacy, since the information sought concerns the person who is asking that it be made public. In the instant case, we are faced with a situation where the individual making the request is not connected in any way with the materials in question. He is an author, interested in the material in order to write a book concerning the organizations and personalities which are the subject of the request. There is no evidence in the record that the plaintiff has obtained the permission of any of the individuals named in his request to examine any or all information held in their FBI files. Moreover, the names of many individuals arise in these documents who are not directly named in the FOIA request but whose activities or the very fact of FBI interest in them might be of value to the plaintiff's research. These individuals obviously also have not had an opportunity to disclose whether they would or would not like the FBI's information on them to be revealed. While this court is not to consider only the interest of the individual making the request, but rather the general public interest in disclosure, in striking the balance, the court is also mindful that the privacy interest in the third parties must be weighed with the knowledge that the individual making this request is not only interested in these documents to satisfy his own curiosity, but is likely to use some or all of the information contained in these documents in a book which likely will be widely

circulated. *See Congressional News Syndicate v. United States Department of Justice*, 438 F.Supp. 538, 542 n.2 (D.D.C.1977) (release to C.N.S. tantamount to unrestricted public disclosure).

The courts, in striking the balance under exemption 7(C), have repeatedly expressed particular concern for protecting those who have been investigated, but not charged, in connection with a crime from the public embarrassment and damage to their reputations which a disclosure of the investigative interest would cause. *Rushford v. Civiletti, supra*, 485 F.Supp. at 479–81 (judges accused of, but never charged with, judicial misconduct or criminal violations); *Malloy v. United States Department of Justice*, 457 F.Supp. 543, 546 (D.D.C.1978) (names of bank robbery suspects); *Librach v. F.B.I.*, 587 F.2d 372, 373 (8th Cir. 1978), *cert. denied*, 440 U.S. 910, 99 S.Ct. 1222, 59 L.Ed.2d 459 (1979); *Pacheco v. F.B.I.*, 470 F.Supp. 1091, 1099 (D.P.R.1979). Only in those cases where there was a particular public interest in the activities of the third parties which were the subject of the files have the courts been inclined to tip the balance in favor of disclosure of information about those third parties. *Common Cause v. National Archives and Records Service*, 628 F.2d 179 (D.C.Cir.1980) (factors such as fact that persons in question were candidates for federal office, not just private citizens, and information concerned campaign contributions which then and now was required by law to be publicly reported require remand to district court to reconsider balance of interests in disclosure of information from Watergate Special Prosecution Force files which would reveal the names of candidates to whom 19 named corporations admitted making, or were alleged to have made, unlawful campaign contributions);

*Congressional News Syndicate v. United States Department of Justice, supra*, 438 F.Supp. at 541–45 (details of contributions made in connection with the "Townhouse Operation" investigated by the Watergate Special Prosecution Force, including names of recipients and contributors never charged with any offense, should be disclosed because of great public interest in full airing of all matters involving alleged misconduct of White House staff, and because the Federal Corrupt Practices Act, which required disclosure of these contributions at the time they were made, "strip contributors and recipients equally of whatever cloak of privacy their relationship would have had in the statute's absence." 438 F.Supp. at 543).

Here, much of the information contained in these documents concerning third persons is the kind of personal detail which is precisely the kind of information Congress meant to protect with this exemption. *See Lamont v. Department of Justice, supra*, 475 F.Supp. at 776–77, n.65, and cases cited therein. Much of the other information is accusations concerning activities and involvement with persons and organizations which have been or are considered subversive. Much of the rest of this information concerns involvement in causes which have been looked upon in a very derogatory manner by certain segments of society.

It is impossible to know at this time how these people would feel about the release of this information; it would be a task beyond the scope of reasonable endeavor to expect the government to track them all down and ask them.[17] Such an effort, moreover, would result in the risk of disclosure of the identities of those mentioned in these files, and might in and of itself be the source of some embarrassment and damage to repu-

---

**17.** Since privacy is a personal right, the balance struck under (b)(7)(C) would be significantly effected if the person whose privacy is subject to protection is known to be dead. However, it is impossible in most of the cases which arise in these documents for the court to know if the individuals are still alive or not. The documents are not so old that one could safely make a presumption that they are dead. In these circumstances and given the importance of the privacy interest at stake, the court has presumed that, absent evidence to the contrary, the individuals mentioned are still alive. The only exception to this presumption involves document 23, attached to the Lang Affidavit. In that instance, the court is taking judicial notice of the fact that "Woody" Guthrie died a number of years ago. He is the only individual for whom the court feels that it is in a position to take such notice.

tation. It may well be that many of these individuals would not care if their names were associated with these investigations or if public disclosure was made of various of their activities from the period in question. It. is. true that a long period of time has passed and that the mood of the country has changed somewhat from that which existed at the time when this information was gathered. On the other hand, the way that this sort of information is looked upon by the nation and by acquaintances is subject to great swings which occur with little warning and often with great rapidity and well beyond the power of this court to predict.

■ The persons named in these documents might well be in a position now where the release of this information, even just the information that the FBI had investigated them, would be personally and/or professionally embarrassing. The information might well make them the target of ridicule and derogatory comments. Certainly much of the information about what people did and with whom they associated is particularly deserving of protection, where those people have not indicated an interest in obtaining this information for public release. Even as to those people who have obtained sufficient public prominence over the years that the court is aware of their present circumstances, we cannot presume to infer how those people would feel about the release of information about their activities during the period in question.

Against these concerns must be weighed the public interest in the disclosure of this information. While there is some substantial public interest in knowing the nature and extent of the FBI's internal security investigations in the 1940s and 1950s, this information can be gleaned from the material already made available and other public documents. The court must be mindful that an individual does not lose his right to privacy simply because he has been the target of an FBI investigation or because information on his activities was collected in the course of the FBI's sometimes overzealous search for subversives in the post-war period. He may, in fact, deserve greater protection, because the connection to such an investigation might prove particularly embarrassing or damaging. *Fund for Constitutional Government v. National Archives and Records Service*, 485 F.Supp. 1, 6 (D.D.C.1978). This court agrees that

> A moment's reflection upon recent political history and the excesses of the internal security investigations of the 1950's should be sufficient to signal caution in dealing with unverified derogatory material within the files of an intelligence gathering agency of government. Indiscriminate public disclosure of such material in response to a citizen's FOIA request would be as much an abuse of agency authority as an intentional release designed to damage persons. The impact on the individual is the same.

*Cerveny v. Central Intelligence Agency*, 445 F.Supp. 772, 776 (D.Colo.1978). This court must therefore, in most cases, strike the balance in favor of protecting the privacy of the individuals who are named in these documents and whose activities and personal data are recorded in these files. *Lamont v. Department of Justice, supra*, 475 F.Supp. at 776–77.

If this court's *in camera* inspection had revealed that the public interest in disclosure of this information was very great, particularly if it disclosed new information concerning official government activities or provided new insights into the scope of the internal security investigations of the 1950s, it may well have been that, at least in some cases, the public interest would have outweighed the privacy interest. This court found no such material. None of the personal information contained in these documents would appear to further any public interest except perhaps some curiosity with the details of the lives of those whom the FBI chose to investigate. It is also true that the passage of time might well begin to diminish the privacy interests of those named in the documents; of course, it may also reduce the public interest in disclosure, as the material begins to take on only historical interest rather than being important

to the making of policy or the reformation of public institutions. *Common Cause v. National Archives and Records Service, supra,* 628 F.2d at 182 n.9. In this case, while a significant period of time has passed, there is no reason to believe that, even 25 or 30 years after most of this data was accumulated, many of the individuals are not still alive and would not be adversely affected in a significant manner by the disclosures. In this case, therefore, the consideration of these factors did not tip the balance in favor of disclosure where the document would reveal information about persons who were of investigative interest to the FBI.

### E. 5 U.S.C. § 552(b)(7)(D)

■ We now turn to the other large group of claims of exemption, those made under exemption 7(D) of the FOIA. As indicated supra p. 1076, while the defendants have carried the burden of showing that the documents are investigatory records compiled for law enforcement purposes, the court finds that the defendants have not presented sufficient evidence to show that these files were the product of either lawful criminal investigations or of lawful national security investigations. *Founding Church of Scientology of Washington, D. C. v. Miller, supra,* 490 F.Supp. 144, 147, 149, 151 n.1 (distinguishing between the two tests). The simple assertion that these documents were compiled for such a purpose does not end the matter, even if that assertion had been made by the Attorney General of the United States. *Weisberg v. United States Department of Justice,* 489 F.2d 1195, 1202 (D.C.Cir.1973), *cert. denied,* 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974). The government has not presented any evidence, other than to cite us to some of the files the statutes under which these investigations allegedly proceeded, of the basis for the investigations, or even as to the internal procedures by which these investigations were initially approved and kept open for many years. As for the material which was found in

"see" reference files, the defendants did not even cite the statutory basis under which those investigatory files were compiled; they simply asserted by blanket statement that all the files in which the documents were found were compiled as part of a lawful investigation of one sort or another.[18] Moreover, the court's own *in camera* inspection of these documents has failed to provide any inkling of the original basis for these investigations, nor any basis for the continuance of the investigations over the course of many years. In fact, much of the material seemed to be the result of general information gathering and monitoring of activities which cannot be related to good faith enforcement of the statutes cited as the basis for the compilation of the "main" files without evidence which was not forthcoming from the defendants. *See Lamont v. Department of Justice, supra,* 475 F.Supp. at 774–76 (insufficient showing by government that surveillance of plaintiff for part of the period in question was related to possible Smith Act violations); *Irons v. Bell, supra,* 596 F.2d at 472 (FBI's conclusory invocation of national security laws does not overcome burden of alleging enough facts to establish a colorable claim of a rational nexus between the organizations and activities investigated and violations of federal law). This court, therefore, will not allow any deletions from the material inspected *in camera* which was claimed to be exempt because it was information provided solely by a confidential source.

■ The court has upheld the deletions made of material which would identify a confidential source. This applies to information concerning or identifying both informants, in the generally understood sense of that word, and persons who were questioned or interviewed by the FBI. Plaintiff has argued that the defendants must provide either specific evidence that an expressed assurance of confidentiality was given the source, or specific evidence of the circumstances in each case that would support a finding that there was an implied assurance of confidentiality. He also ar-

---

18. *See supra,* p. 1075.

gues that such an inference cannot be made where there is evidence that the source was potentially a witness in a criminal proceeding and understood this at the time that the information was transmitted.

The court rejects plaintiff's arguments. The burden which the plaintiff wishes to place on the defendants is an impossible one, especially for information which is as old as the information in these files. Nothing in the legislative history of this exemption suggests that such a burden is to be placed on the government. To the contrary, the legislative history of the 1974 amendments suggest that the burden is to be placed on agencies such as the FBI to prove that confidentiality was assured a source is minimal. For instance, Senator Hart, the author of the 1974 amendments, stated on the floor of the Senate, in the course of leading the successful effort to override President Ford's veto of the legislation, "...all the FBI has to do is to state that the information was furnished by a confidential source and it is exempt." Committee on Government Operations & Committee on the Judiciary, 94th Cong., 1st Sess., *Freedom of Information Act and Amendments of 1974 (P.L. 93–502)*, at 451. There is other evidence that Congress understood that these amendments would protect confidential files of law enforcement agencies. *See Church of Scientology of California v. United States Department of Justice*, 410 F.Supp. 1297, 1302–03 (C.D.Cal. 1976), *affirmed in part, reversed and remanded in part*, 611 F.2d 738 (9th Cir. 1980). We find that the "functional" approach to these claims adopted by a number of courts both captures the intent of Congress and results in the proper allocation of the burden as to this issue. Applying that approach here, it is clear that the FBI's "investigatory function depends for its existence upon information supplied by individuals who in many cases would suffer severe detriment if their identities were known." *Kaminer v. NLRB*, 90 LRRM 2269, 2272 (S.D.Mass.1975); *Lamont v. Department of Justice, supra*, 475 F.Supp. at 779–80; *T.V. Tower, Inc. v. Marshall*, 444 F.Supp. 1233, 1235–36 (D.D.C.1978).

Particularly in the context of the type of investigations for which the FBI was compiling this information, the court finds it is reasonable to presume that the informants expected that their identities would remain secret and that they would not have otherwise provided this information. The FBI's tradition of treating this information confidentially, as well as the markings and other indicia on the documents themselves which indicate that the identities of the informants were carefully guarded even within the FBI itself, also lend support for this conclusion. Moreover, however one might feel about the object of these particular investigations, the important mission of the FBI would be severely hampered if people who provide information, often placing themselves in precarious circumstances by doing so, could not be confident that their identities would not be publicly disclosed by the FBI itself. *Pope v. United States*, 599 F.2d 1383, 1386–87 (5th Cir. 1979) (similar conclusion for IRS sources); *Nix v. United States*, 572 F.2d 998, 1003–04 (4th Cir. 1978); *Ramo v. Department of the Navy, supra*, 487 F.Supp. at 133; *Pacheco v. F.B.I., supra*, 470 F.Supp. at 1102–03; *Malloy v. United States Department of Justice, supra*, 457 F.Supp. at 546.

For some of the sources of information, the documents inspected by the court make it clear that they were under no obligation, nor had any intention, to testify in any judicial proceeding. For those sources for whom this is not as clear, the court holds that the mere possibility that they might be called upon to testify at a trial if charges are ever brought does not negate the assumption that the sources considered their contact with the FBI to be otherwise confidential and hence within the reach of exemption 7(D). *See T.V. Tower, Inc. v. Marshall, supra*, 444 F.Supp. at 1237–38; *Nix v. United States, supra*, 572 F.2d at 1004 (purpose of exemption 7(D) is to assure confidentiality "save for the proper exercise of the power of supoena").

This court also holds that the term "confidential source" applies not only to

persons, but also to law enforcement agencies and institutions. Although this court recognizes that some courts have held that this exemption applies only to natural persons, *e.g., Ferguson v. Kelley,* 448 F.Supp. 919, 925 (N.D.Ill.1977); *on reconsideration,* 455 F.Supp. 324 (1978); *Katz v. Department of Justice,* 498 F.Supp. 177, 182–84 (S.D.N. Y.1979) (exemption applies to law enforcement agencies, but not to other organizations), the more persuasive authority, based on a careful examination of the legislative history of this section, is that the word "source" was meant to be given a broad meaning and includes both law enforcement agencies and financial and commercial institutions. *Lasar v. United States Department of Justice, supra,* 636 F.2d at 489–91; *Church of Scientology v. United States Department of Justice, supra,* 410 F.Supp. at 1302–04; *followed in Nix v. United States, supra,* 572 F.2d at 1005; *Pacheco v. F.B.I., supra,* 470 F.Supp. at 1103.

 The court, therefore, has sustained all deletions which would identify confidential sources of information. Included are symbol numbers, file numbers and "T" symbols, in those cases where the association of the same numbers and symbols with various different pieces of information would possibly allow someone familiar with the events in question to identify the source.[19]

 The court also holds that the identity of persons interviewed by the FBI in connection with the investigations which produced information contained in these documents is protected by exemption 7(C). The court is not speaking here of informants, but those who were sought out by the FBI and interviewed about persons or organizations of investigative interest. Again, aside from mere curiosity, there seems to be little public interest in the disclosure of their identities. On the other side of the balance, this court agrees with the court in *Lamont v. Department of Justice, supra,* that

[c]itizens who feel they have a duty to respond to governmental investigatory inquiries, even though they may disagree or question its purpose, are entitled to protection; their cooperation should not be penalized by public exposure at a later time, when it may not meet with community approbation.

475 F.Supp. at 779. Particularly in the context of the time and place of these investigations, it would be particularly unfair to subject such cooperative persons to the embarrassment and ridicule which might result from such a disclosure. The court therefore would also withhold their identity and identifying information on this basis. *Maroscia v. Levi,* 569 F.2d 1000, 1002 (7th Cir. 1977); *Pacheco v. F.B.I., supra,* 470 F.Supp. at 1099; *Ferguson v. Kelley, supra,* 448 F.Supp. at 924–25.

### F. 5 U.S.C. § 552(b)(7)(E)

The defendants also asserted that certain information was withheld because it would disclose investigative techniques. 5 U.S.C. § 552(b)(7)(E). The affidavit submitted by the government simply stated that "[t]o release these techniques, which are still valuable and continue to be utilized successfully, would afford the subjects of FBI investigations opportunity to circumvent detection. Any further description of the individual techniques would compromise the nature of those techniques." Affidavit of David S. Byerly, filed November 3, 1980, at 16.

 The legislative history of this exemption makes clear that it is to be applied only to techniques and procedures generally unknown to the public. Conference Report # 93–1200, 93rd Cong., 2nd Sess., *reprinted in* [1974] *U.S.Code and Admin.News,* at 2285, 2291; *Malloy v. United States Department of Justice, supra,* 457 F.Supp. at 545; *Ferguson v. Kelley, supra,* 448 F.Supp. at 922; *Ott v. Levi,* 419 F.Supp. 750, 752 (E.D. Mo.1976). Once again, the conclusory affidavits submitted by the defendants failed

---

19. This is, in fact, an alternative reason for deleting this information, since these symbols and numbers are also exempt from disclosure under 5 U.S.C. § 552(b)(2). *See* discussion, *supra,* at p. 1073.

to present sufficient facts to carry their burden of showing that the deletions fell within this exemption. The *in camera* inspection made by this court did not provide the missing justification. At least as to the instances where the exemption was claimed in these documents, the techniques sought to be protected, such as mail covers and use of post office boxes, are in this court's judgment precisely the type of commonly known investigative techniques which this exemption was not meant to reach. The court has no basis for believing their disclosure will result in the revelation of investigative techniques which are "so unique as to warrant the exemption." *Ferguson v. Kelley, supra,* 448 F.Supp. at 926. The government has not provided any explanation to convince the court otherwise. Under these circumstances, the court has ordered the release of those portions of these documents inspected *in camera* which the government had claimed were exempt under 7(E). *See Coastal Gas Corp. v. Department of Energy, supra,* 617 F.2d at 861 (government must provide sufficient evidence to carry burden or material will be ordered released by the court).

### G. Material Outside the Scope of the Request

A number of the documents and portions of the documents were withheld on the ground that the material did not fall within the bounds of the request made by the plaintiff. These deletions, not surprisingly, are located principally in those documents found in "see" references, which meant that they were documents filed under some other person or organization's name, but contained some reference to one or more of the individuals or organizations of interest to the plaintiff.[20] These references are in some instances lengthy and directly related to the subject of the whole document, and in other instances consist just of passing comments and are not directly tied into all or part of the rest of the document.

 The agency is under an obligation to release to the plaintiff all records which fall within the scope of his request, which did reasonably describe the records in which he was interested. 5 U.S.C. § 552(a)(3). Given the policy embodied in the FOIA requiring disclosure of information in government documents unless it falls within the reach of one of the specified exemptions, the agency should err on the side of liberally construing what material falls within the scope of the request. On the other hand, the agency is under no obligation to release an entire document simply because the name of a person or organization which is the subject of the request is mentioned in the document. In fact, any other approach could work to the detriment of the person making the request, since an agency could inundate the requester with mounds of documents of dubious relevancy, not only making it harder to pick out the material which was truly the object of the request, but also potentially making the costs of receipt of the documents prohibitively expensive. *See* 5 U.S.C. § 552(a)(4)(A) (allowing an agency to charge fees to cover the costs of search and duplication). The agency is obliged to release any information, subject to the specified exemptions, which relates to the subject of the request or which in any sense sheds light on, amplifies, or enlarges upon that material which is found in the same documents. The agency may withhold material found in documents which are in any way responsive to the request only if that material is clearly and without any doubt unrelated to the subject of the request.

In this instance, the court's *in camera* inspection revealed that the defendants have improperly withheld some material which could reasonably be considered relevant to the request made by the plaintiff. The court has ordered that the material so withheld be released in those instances where the court felt that there was any possibility that the material might bear some relationship to the subject of the request, or if the information was necessary to understand the context in which the ref-

**20.** See note 14, *supra.*

erence to the subject of the request arises in the document. The court upheld the deletions where it was convinced that the material was utterly unrelated to the subject of the plaintiff's request.

## H. *Conclusion*

The court in this memorandum opinion has endeavored to explain as fully as possible the reasons which lie behind its rulings on the propriety of the various deletions which appear in the documents which we have inspected *in camera.* Because of the large number of deletions at issue, and given the fact that each arises in its own context within a document, there may be a few examples of unique claims which do not fit within any of the discussion herein. In those cases, this court will endeavor to provide any necessary explanation of its ruling in the appendix to this opinion, wherein the court will set out its rulings deletion-by-deletion, document-by-document. However, in virtually all instances, the court's decision was guided by the application of the reasoning discussed herein to the specific deletion.

The defendant is therefore ordered to release to the plaintiff portions of documents which have been inspected *in camera* by the court and have been found to be improperly withheld under the FOIA, in accordance with the individual rulings set out in the appendix to this memorandum opinion. All other material in these documents which was deleted by the defendant is held to be properly withheld under the terms of the FOIA, for the specific reasons which are set out in the appendix to this memorandum.

SO ORDERED.