**DAMES & MOORE, Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF THE TREASURY and Donald T. Regan, Defendants.**

**No. CV 81–1173 AWT.**

United States District Court, C. D. California.

July 26, 1982.

Merlin W. Call, C. Stephen Howard, Mark A. Borenstein, Tuttle & Taylor, Los Angeles, Cal., for plaintiff.

J. Paul McGrath, Asst. Atty. Gen., Vincent M. Garvey, Penny Quinn Seaman, Attys., Dept. of Justice Civ. Div., Washington, D. C., Stephen S. Trott, U. S. Atty., Los Angeles, Cal., for defendants.

MEMORANDUM OPINION

TASHIMA, District Judge.

This matter is before the Court on cross-motions for summary judgment. The facts are not controverted; the case is ripe for decision. These cross-motions present the question of whether the United States Department of the Treasury (the "Department" or the "Treasury") has carried its burden of establishing that certain census forms submitted by individuals and corporations, pursuant to 31 C.F.R. §§ 535.615 and 535.616, and the aggregate documents which were compiled therefrom, are exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b).[1]

This controversy arose when plaintiff Dames & Moore filed a FOIA request with the Treasury on February 2, 1981. This request covered all census forms filed and all records which summarize, collate, analyze or tabulate the results of the 1980 "Census of Claims by United States Persons Against Iran", all records which summarize, collate, analyze or tabulate the results of the 1980 "Census of Blocked Iranian Assets", all records which identify persons or entities which filed forms TFR–615 and TFR–616 (the census forms) with the Office

1. All subsequent citations to FOIA will be to the section (§) of the Act only, as codified in Title 5, U.S. Code.

of Foreign Assets Control ("OFAC") during 1980, and all records which summarize, tabulate, analyze or otherwise relate to the response of persons or entities to Question No. 9, Part C, of Form TFR–616. This request encompasses 9,000 census forms submitted by claimants to the Department, and approximately 103 aggregate documents which were produced from the raw data.

The Treasury, through Dennis O'Connell, Director of the OFAC, denied plaintiff's request for documents, invoking FOIA exemptions (b)(1) and (b)(4), § 552(b)(1) & (4). Plaintiff exhausted its administrative remedies by appealing to acting Assistant Treasury Secretary for Enforcement and Operations John P. Simpson. With the exception of one document, which was released, plaintiff received a confirmation of the previous denial of its request. In that denial, in addition to exemptions (b)(1), (b)(4), Mr. Simpson also invoked exemptions (b)(5) and (b)(6). He further concluded that the Department could not segregate non-exempt material from that which was exempt under the Act without rendering it meaningless.

At the time Dames & Moore filed its FOIA request, only eighteen of the aggregate documents and none of the census reports were classified. One day before plaintiff's administrative appeal was decided, the remaining aggregate documents were classified. Two months after this lawsuit was filed, at the suggestion of the Assistant United States Attorney defending the case, the Department also classified the census reports. Prior to their classification, the census forms were not subject to the stringent security requirements applicable to classified documents; however, there is no indication that they were accessible to persons other than OFAC personnel.

■ In order to establish that the documents are exempt from disclosure under FOIA, the agency bears the burden of showing that each document is wholly exempt. *Federal Open Market Comm. v.*

*Merrill*, 443 U.S. 340, 352, 99 S.Ct. 2800, 2808, 61 L.Ed.2d 587 (1979). Because the affidavits originally submitted by the Treasury appeared insufficient to meet this burden, the Court took the motions under submission and granted the agency leave to file, *in camera* if necessary, additional affidavits directed to exemptions (b)(1) and (b)(5). The Court also requested that the documents be submitted *in camera* for inspection. Dames & Moore was granted the opportunity to respond to the unclassified portions of the supplemental affidavits submitted by the agency.

■ In accordance with this Court's duty to conduct a *de novo* review of the agency's decision not to disclose, § 552(a)(4)(B); *Church of Scientology, etc. v. United States Dep't of Army*, 611 F.2d 738, 742 (9th Cir. 1979); *Harvey's Wagon Wheel, Inc. v. NLRB*, 550 F.2d 1139, 1141 (9th Cir. 1976), I have examined all documents and affidavits submitted. I find that the agency has met its burden of proof; therefore, the documents are exempt from disclosure. Both the census forms and the aggregate documents fall within the national security exemption, § 552(b)(1). In addition, the aggregate documents fall within the interagency or intra-agency memoranda exception, § 552(b)(5). I find also that it is impossible to segregate portions of the documents which might be subject to disclosure; any portions which might be released would have no meaning to plaintiff. *See Hayden v. Nat'l Sec. Agency/ Cent. Sec. Serv.*, 608 F.2d 1381 (D.C.Cir. 1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980). Because these exemptions completely shield the requested documents from disclosure, it is unnecessary to decide whether the other exemptions claimed by the agency are applicable. Accordingly, summary judgment is granted in favor of the agency as to all documents.

I. *The National Security Exemption*

FOIA's national security exemption, § 552(b)(1), protects against disclosure of

agency records which have been "(A) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive Order." The parties agree that Executive Order 12065 of June 28, 1978, 3 C.F.R. § 190 (1979), governs the classification of the documents here in issue.[2]

Executive Order 12065, as supplemented by the Treasury's regulations implementing the order, 28 C.F.R. Part 17 (1980), sets forth both substantive and procedural criteria relating to proper classification of documents. Executive Order 12065 permits the documents here in issue to be classified as confidential if it is determined that their "unauthorized disclosure . . . reasonably could be expected to cause identifiable damage to the national security." In addition, Executive Order 12065 requires that documents be marked, § 1–501, and portioned as to segregable parts at the time of their original classification. § 1–504. In the event that they are classified subsequent to receipt of a FOIA request, such classification must be consistent with the Executive Order and authorized by the agency head or deputy head. Such classification authority must be exercised personally, on a document by document basis, by the agency head or deputy head. § 1–606.

In an effort to establish that it has satisfied the substantive criteria of Executive Order 12065, the Treasury submitted *in camera* the declaration of James H. Michel, Deputy Legal Adviser of the Department of State. That declaration, in a detailed manner, describes the reasons why the release of census and aggregate documents could reasonably be expected to cause identifiable harm to national security and foreign policy. While the classified portions of this affidavit cannot be restated here, even the unclassified paragraphs illuminate the national security/foreign policy interest in non-disclosure. Mr. Michel points out that from the outset, it was envisioned that an agreement with Iran for the release of the hostages would necessarily include provisions for the disposition of Iranian assets and American claims. (¶ 2.) In order to prepare for such negotiations, the Treasury collected claims and assets information on the census forms here in issue. The individuals and corporations reporting did so on the understanding that if they did not report, they might be excluded from the settlement process. (¶ 4.) Subsequent to the conclusion of the Algiers Declarations, the Iran-United States Claims Tribunal convened at The Hague in The Netherlands. (¶ 6.) *See generally Dames & Moore v. Regan*, 453 U.S. 654, 664–66, 101 S.Ct. 2972, 2979–80, 69 L.Ed.2d 918 (1981). The ongoing negotiations there have ramifications on foreign policy and national security issues both in relation to Iran and in a broader context. (¶¶ 10, 12, 15–18 [classified].) Giving the Michel declaration the substantial weight to which it is entitled, *Baez v. United States Dep't of Justice*, 647 F.2d 1328 (D.C.Cir.1980), I am persuaded that the agency has met the substantive criteria of Executive Order 12065.

The procedural requirements of Executive Order 12065 present a somewhat more difficult question. The documents here in issue were not marked and portioned as they were received. They were classified after the receipt of plaintiff's FOIA request. While the aggregate documents were subjected to a document by document review prior to their classification, as required by Executive Order 12065, the census forms were not subjected to such a review. Deputy Secretary McNamar, who was in charge of the belated classification, however, claims that such a review was unnecessary because of his general familiarity with the content of the forms.

While there were definite shortcomings in the agency's compliance with the proce-

---

2. On April 2, 1982, the President promulgated Executive Order 12356, which revokes and replaces Executive Order 12065. 47 Fed.Reg. 14,-874 (1982). However, since the revocation is not effective until July 31, 1982, it is unnecessary to examine any possible changes made by the new Executive Order.

dural criteria, they do not, on these facts, undermine the validity of the exemption. First, despite plaintiff's inferences to the contrary, there is no evidence of bad faith on the part of agency personnel. The census forms were collected during the heat of the Iranian crisis; the Department's failure to immediately mark and portion them appears attributable to the urgency of the situation with which it was confronted. While this non-compliance with Executive Order 12065 may have been negligent, it is in the nature of "an a-typical slip-up," *Lesar v. United States Dep't of Justice*, 455 F.Supp. 921, 925 (D.D.C.1978), *aff'd*, 636 F.2d 472 (D.C.Cir.1980), which should not deprive the agency from invoking the exemption. Second, the belated classification of the documents, in the absence of bad faith, is not sufficient to deprive the agency of the exemption; belated classification procedures are specifically set forth in Executive Order 12065.

Finally, this Court's review of the census forms reveals that it would have been an exercise in futility to review each of the 9,000 forms submitted prior to classification. The Executive Order cannot be read as requiring a document by document review of forms which differ only as to the specific answers submitted by the reporters. Mr. McNamar's general familiarity with the type of information requested, and the type of information provided by the reporters, gave him an ample basis upon which to make the classification decision.

In conclusion, the Treasury has demonstrated compliance with the substantive requirements of Executive Order 12065. The deviations from the procedural criteria were minor and do not undermine the validity of the agency's decision to withhold the documents. Therefore, the aggregate documents and census forms are exempt from disclosure pursuant to § 552(b)(1).

## II. *Exemption 5—Inter-Agency or Intra-Agency Memoranda*

Of the other exemptions invoked in this case, the affidavits and the documents themselves establish the applicability of the inter-agency or intra-agency memoranda exemption, § 552(b)(5). This exemption is invoked with respect to thirty-four aggregate documents, but appears equally applicable to all of the aggregate documents generated from the information on the census forms.

■ Exemption 5 applies to documents that are (a) inter-agency or intra-agency memoranda or letters and (b) consist of material that would not be available by law to a party in litigation with the agency. *Federal Open Market Comm., supra*, 443 U.S. at 352, 99 S.Ct. at 2808. It has been construed as protecting materials which would be protected under the attorney-client privilege, *Mead Data Cent., Inc. v. Air Force*, 566 F.2d 242, 252–55 (D.C.Cir. 1977), the attorney work product privilege, *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 154, 95 S.Ct. 1504, 1518, 44 L.Ed.2d 29 (1975), the executive "deliberative process" privilege, *EPA v. Mink*, 410 U.S. 73, 85–90, 93 S.Ct. 827, 835–37, 35 L.Ed.2d 119 (1973), and a qualified privilege for confidential commercial information, at least to the extent that the information is generated by the Government itself in the process leading up to awarding a contract. *Federal Open Market Comm., supra*, 443 U.S. at 359, 99 S.Ct. at 2811. Although purely factual material is generally subject to disclosure, it may be exempt if it is inextricable without compromise of the deliberative process. *Washington Research Project, Inc. v. HEW*, 504 F.2d 238, 249 (D.C.Cir.1974), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975); *Montrose Chemical Corp. v. Train*, 491 F.2d 63, 71 (D.C.Cir.1974). A summary of factual material that is part of the deliberative process may likewise be exempt, even though the facts themselves are on the public record. *Washington Research Project, Inc., supra*, 504 F.2d at 249.

Dames & Moore challenges the applicability of Exemption 5 on several grounds. First, it contends that the government should, in effect, be estopped from relying on the exemption because over the course of this litigation it has raised theories in

addition to the "deliberative process" argument originally relied upon. Plaintiff further argues that at least four of the documents are non-pre-decisional in that they were developed after the release of the hostages. In addition, Dames & Moore contends that much, if not all, of the material is overwhelmingly factual and that any truly deliberative material could be segregated and redacted.

While it is true that the Treasury expanded its reliance on Exemption 5, plaintiff has cited no authority which precludes an agency from assuming an adversary stance in the litigation and seeking to maximize the bases upon which it might prevail.

Further, plaintiff has a basic misconception of the scope of the negotiations and decisions to which these documents are related. As the Michel declaration explains, the release of the hostages was only the beginning of negotiations between Iran and this country. The validity of the claims against Iran is currently being decided through negotiations in The Hague. Thus, the aggregate documents are truly pre-decisional in that this country's policy has yet to be fully developed.

Moreover, although the details of the role of the United States government in the claims negotiations are classified information, the relationship of the government to at least certain claimants, based on accepted principles of international law, is closely analogous to the attorney-client relationship. Under the Algiers Declarations, small claimants (those whose claims are for less than $250,000) can only have their claims presented by and through the United States, *i.e.*, they cannot present and prosecute their own claims. Under the espousal of claims doctrine, the United States controls the disposition of these small claims, including settlement on such terms as it deems appropriate without the consent of the claimant. "Thus," as Mr. Michel stated, "the relationship of the small claimants to their government in this situation is, if any-

thing, one of greater trust than that of private clients to their attorney." (¶ 13.)[3]

Finally, while the aggregate documents contain factual material, the organization and categorization of that material is indicative of the United States' negotiation approach, and in some instances, of the government's earnest, if tentative, appraisal of the validity of an entire group of claims. In sum, this is material which, though factual in part, reflects deliberative, pre-decisional policy. It is exempt from disclosure on the grounds that it is part of the executive "deliberative process," that it is essentially attorney work product, and that it is protected by analogy to the attorney-client privilege in the setting of proceedings pending before the Iran-United States Claims Tribunal. All of these privileges are within the scope of Exemption 5.

IT IS ORDERED:

1. That summary judgment be granted in favor of the United States Department of the Treasury;

2. That the motion for summary judgment by Dames & Moore is denied.

---

**3.** Although the above discussion pertains to small claimants, it goes without saying that the United States could, if the government determined it to be in the national interest, reopen negotiations on the Algiers Declarations on a government-to-government basis and, in that context, "espouse" the claims of all United States claimants, including large claimants. In this sense, the attorney-client analogy applies to all claimants.