Frank **WILKINSON,** etc., et al., Plaintiffs,

v.

**FEDERAL BUREAU OF INVESTIGATION,** etc., et al., Defendants.

No. CV 80–1048 AWT.

United States District Court, C.D. California.

April 3, 1986.

Richard K. Willard, Asst. Atty. Gen., Civil Div., John J. Farley, III, Director, Torts Branch, R. Joseph Sher, Sr. Trial Counsel, Torts Branch, Esther I. Estryn, Trial Atty., Torts Branch, Civil Div., Dept. of Justice, Washington, D.C., Robert C. Bonner, U.S. Atty., Elgin Edwards and Diane Bardsley, Asst. U.S. Attys., Los Angeles, Cal., of counsel, for defendants.

Paul L. Hoffman, ACLU Foundation, Los Angeles, Cal., Douglas E. Mirell, Peter N. Scolney, Debra J. Albin-Riley, Steven P. Tapia, David P. Crochetiere and Kenneth N. Russak, Los Angeles, Cal., Philip J. Hirschkop, Alexandria, Va., for plaintiffs.

## MEMORANDUM OPINION

TASHIMA, District Judge.

### BACKGROUND

This is an action arising out of the Federal Bureau of Investigation's ("FBI") surveillance and investigation of the National Committee Against Repressive Legislation ("NCARL")[1] and Frank Wilkinson, the group's former Executive Director. Plaintiffs are NCARL, Wilkinson and four sustaining members of NCARL. For the purpose of damages only, a plaintiff class has been certified, consisting of all individuals who have been sustaining members of NCARL for at least one year from 1960 to the present. *See Wilkinson v. FBI*, 99 F.R.D. 148 (C.D.Cal.1983).

Plaintiffs allege that in the early 1960's the FBI initiated an investigation of NCARL and its members as a part of its COINTELPRO "Communist Party—USA" program and that the investigation of Wilkinson began independently over 15 years previous thereto. They assert that these investigations were designed not to uncover potential criminal activity, but instead to monitor and disrupt plaintiffs' lawful activities through the use of various illegal techniques, such as warrantless electronic surveillance, "black bag jobs" and *agents provacateur*.[2] Plaintiffs seek money damages, injunctive and declaratory relief un-

---

1. NCARL, formerly known as the National Committee to Abolish the House Un-American Activities Committee, was formed to oppose and abolish the so-called McCarthy investigations. The group has continued to remain active since the House Committee was dissolved, opposing legislation it views as repressive.

2. *See* Second Amended Complaint, filed Feb. 26, 1982, ¶ 22.

der, *inter alia,* 42 U.S.C. §§ 1983–1986 and the United States and California Constitutions.

In addition, plaintiffs allege that defendants have violated the Freedom of Information Act ("FOIA" or the "Act"), 5 U.S.C. § 552,[3] by improperly deleting extensive portions of the documents produced pursuant to a valid FOIA request. Both plaintiffs and defendants have moved for summary judgment on the FOIA claim. These cross-motions are the matters currently before the Court.

Plaintiffs contend that defendants not only refused to comply fully with their initial FOIA request, but also improperly redacted the bulk of the material in the documents once they were finally produced. Plaintiffs therefore argue that they are entitled to summary judgment on their FOIA claim and ask the Court to compel the FBI to produce immediately all of the documents in unredacted form.

Defendants, on the other hand, argue that all of the redactions are proper according to the various statutory exemptions set out in FOIA. Thus, their cross-motion for summary judgment on the FOIA claim, seeks judgment that plaintiffs are entitled to no further disclosure of the redacted portions of the documents.

The resolution of these motions is complicated by the sheer volume of the material involved—over 12,000 documents have been produced in response to plaintiffs' FOIA request. In order to facilitate the Court's ruling on these cross-motions, the parties have stipulated that plaintiffs are to select a representative sample of the documents to submit to the Court for a ruling. Pursuant to this stipulation, plaintiffs have selected 44 documents, consisting of almost 140 pages, as the subject of their motion.[4]

Although these sample documents will be the primary focus of this opinion, in view of the fact that many of the same issues undoubtedly will arise with respect to the vast number of remaining documents, this opinion will attempt to set forth some general principles to guide the parties in the resolution of any disputes that may arise with respect to the remaining documents. For the reasons set forth below, I conclude that at this time neither party is fully entitled to summary judgment on the FOIA claim.

## DISCUSSION

### A. STANDARD OF REVIEW

■ Congress enacted FOIA to open agency action to the light of public scrutiny. The Act was designed to provide a workable and balanced formula making available information that ought to be public, while at the same time protecting information that must remain confidential in order to protect legitimate governmental functions. *See, e.g., Dep't of the Air Force v. Rose,* 425 U.S. 352, 360–61, 96 S.Ct. 1592, 1598–99, 48 L.Ed.2d 11 (1976). Pursuant to this scheme, the Act states that a document may be withheld from the public only if the information contained in the document falls within one of the nine statutory exemptions set forth in § 552(b). Because the dominant objective of the Act is disclosure, not secrecy, these exemptions are explicitly made exclusive and are to be narrowly construed. *Rose,* 425 U.S. at 361, 96 S.Ct. at 1599; *Van Bourg, Allen, Weinberg & Roger, v. NLRB,* 751 F.2d 982 (9th Cir.1985).

■ The district court must review the exemptions claimed *de novo,* and the burden is on the government to establish that the exemptions are justified. § 552(a)(4)(B); *Church of Scientology v. United States Dep't of the Army,* 611 F.2d 738, 742 (9th Cir.1979) (*"Scientology I"*). In order to satisfy this burden, the government "may not rely upon conclusory and generalized allegations of exemptions." *Id., quoting Vaughn v. Rosen,* 484 F.2d

---

**3.** All citations to FOIA will be to the section number only, *i.e.,* § 552.

**4.** The parties agree that Ex. 42 was improperly included in plaintiffs' sample; therefore, only 43 documents are addressed by Agent Cook's affidavit.

820, 826 (D.C.Cir.1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974). Rather, the affidavits justifying the claimed exemption(s) must be detailed enough to enable the court to make an independent assessment of the government's claim of exemption.[5]

■ Where the affidavits are inadequate to enable the court to review the exemptions *de novo,* the court can order that the unexpurgated documents be produced for *in camera* review. *Scientology I,* 611 F.2d at 742–43. Such review, however, is not to be used as a substitute for an inadequate *Vaughn* index, especially where the documents produced to plaintiffs are voluminous. The government retains at all times the burden to prove the information's exempt status. *Id.* at 743. "Only where the government has made a bona fide attempt to provide a sufficient index and the claim for exemption cannot be evaluated merely from the index should the court embark upon the burdensome task of *in camera* review." *Powell v. United States,* 584 F.Supp. 1508, 1513 (N.D.Cal.1984).

In this case, as set out below, the Court finds that the government's affidavit is inadequate to sustain several of its asserted

exemptions. Instead of immediately ordering disclosure, however, the government will be permitted to file one further affidavit explaining in detail why the exemptions should apply. Before submitting any further affidavit, the Court expects the government to review carefully any claimed exemptions according to the standards set forth below, and to release any further information which should not have been redacted.[6]

**B. EXEMPTION 1: NATIONAL SECURITY**

■ Exemption 1, § 552(b)(1), protects from disclosure matters that are: "(A) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." [7] *Id.* This Court has the authority to review *de novo* the agency's classification decision; however, in doing so, it must afford "substantial weight" to the affidavits submitted in support of the exemption. *See, e.g., Powell,* 584 F.Supp. at 1516; *Dames & Moore v. United States Dep't of the Treasury,* 544 F.Supp. 94, 97 (C.D.Cal. 1982).

---

**5.** Such affidavits and declarations are often referred to as *"Vaughn* affidavits" or *"Vaughn* indexes," after the leading case on their use, *Vaughn v. Rosen, supra.*

**6.** FOIA provides that agencies may, by regulation, establish "a uniform schedule of fees ... limited to reasonable standard charges for document search and duplication." § 552(a)(4)(A). Such fees may be waived "where the agency determines that waiver or reduction of the fee ... primarily benefit[s] the general public." *Id.* In their initial request for documents, plaintiffs sought such a waiver, but their request was denied by the agency. The agency's decision was later affirmed on administrative appeal.

Plaintiffs now argue that the denial of the fee waiver by the government was an abuse of discretion and should be reversed. Judicial review of such refusals to waive fees under the Act is governed by the standard of whether such refusal is arbitrary and capricious, and an abuse of discretion. *See, e.g., Crooker v. Dep't of the Army,* 577 F.Supp. 1220, 1224 (D.D.C.1984).

The Court has reviewed plaintiffs' contentions and, based on the limited record before it, con-

cludes that the agency's decision that a waiver would not "primarily benefit the general public" was not arbitrary and capricious. Therefore, the Court upholds denial of the fee waiver. However, the Court notes that if further disclosure of redacted documents is later ordered or if the government reevaluates its claims of exemptions, any further disclosure of the documents shall be without charge to plaintiffs. They have already paid for the documents (in many cases, virtually blank sheets of paper) once; if it turns out that exemptions were improperly asserted by the FBI, there is no reason why they should pay for the same documents a second time.

**7.** The Exec. Order currently pertaining to the classification of documents is Exec. Order 12356, 47 Fed.Reg. 14,874 (Apr. 2, 1982). The Order contains an important caveat:

In no case shall information be classified in order to conceal violations of law ...; to prevent embarrassment to a person, organization, or agency; ... or to prevent or delay the release of information that does not require protection in the interest of national security. *Id.* at § 1.6(a).

Out of the 43 sample documents submitted by plaintiffs, almost half were fully redacted pursuant to Exemption 1. However, between the time that plaintiffs filed this motion and defendants responded, the government states that developments in "related litigation" persuaded it that the material in the sample documents deleted pursuant to Exemption 1 might no longer be classifiable. Declaration of Special Agent Robert F. Peterson, filed Oct. 5, 1985, at pp. 2–3. Agent Peterson states that upon review of the sample documents, he determined [8] that the material submitted to plaintiffs should be declassified.[9]

Plaintiffs argue that this declassification is proof that Exemption 1 was improperly used by the government and justifies summary judgment in their favor. They also contend that the declassification was a direct result of their motion and that the Court should find that they have "substantially prevailed" on this issue.

Defendants, on the other hand, argue that this part of plaintiffs' motion is moot, in view of the fact that the government is no longer relying on this exemption. They also contend that declassification of the documents was *not* the result of plaintiffs' suit, but instead resulted from developments in other cases that triggered the ongoing review sanctioned by Executive Order 12356.

The question of whether plaintiffs' suit triggered the declassification decision need not be addressed at this time—this is an issue more appropriately considered, if at all, at a later stage in determining whether plaintiff is entitled to an award of attorney's fees.[10] However, the question of whether the Exemption 1 motion is moot deserves further discussion. It is true that

if the sample documents were the only ones at issue in this litigation, plaintiffs' Exemption 1 motion would probably be moot. However, as mentioned above, the sample documents encompass only 43 documents out of a total of over 12,000. Presumably, many of the remaining documents not submitted to the Court are also redacted pursuant to this exemption; therefore, the question of whether those documents are properly classified is still at issue. Thus, the government should re-examine all remaining documents as to which an Exemption 1 claim has been asserted, according to the standards used by Agent Peterson in his re-review of the sample documents. Any information of a similar nature to that declassified in the sample documents is to be disclosed to plaintiffs. The government may, of course, assert any other FOIA exemption that applies to the information, but any redactions made in the documents must comply with the standards set forth in this opinion.

## C. EXEMPTION 2: INTERNAL RULES AND PRACTICES

Exemption 2 exempts from disclosure information "related solely to the internal personnel rules and practices of an agency." § 552(b)(2). The Supreme Court has interpreted this exemption narrowly, holding that it applies only to "routine matters" of "merely internal significance" in which "the public could not reasonably be expected to have an interest." *Rose*, 425 U.S. at 369–70, 96 S.Ct. at 1602–03.

 Here, defendants argue that Exemption 2 was applied properly to delete the FBI symbol number codes on the documents identifying (a) confidential informants, and (b) investigatory techniques.[11] Courts generally have held that this exemption properly applies to FBI symbol num-

**8.** Agent Peterson's declaration states that he has been designated an authorized declassification authority pursuant to Exec.Order 12356, §§ 1.2, 3.1.

**9.** This did not result in the information in the documents being disclosed, however. Although the documents had been declassified, with the exception of only one document, Ex. 28, the FBI continued fully to redact the information in

these documents pursuant to other exemptions, usually Exemption 7(D).

**10.** FOIA provides that the court may award attorney's fees in cases where "the complainant has substantially prevailed." § 552(a)(4)(E).

**11.** Although the government has only applied this exemption once, in Ex. 28, to delete the symbol number identifying the form of electronic surveillance used, there is a strong likeli-

ber codes identifying confidential informants. *See, e.g., Lesar v. United States Dep't of Justice,* 636 F.2d 472, 485–86 (D.C. Cir.1980); *Ramo v. Dep't of the Navy,* 487 F.Supp. 127, 133–34 (N.D.Cal.1979). The rationale for this rule is that, especially in view of the dangers that would accompany identifying such informants, "[t]he means by which the FBI refers to informants in its investigative files is a matter of internal significance in which the public has no substantial interest." *Lesar,* 636 F.2d at 485–86. The Court agrees with this view and, therefore, holds that deletions in the documents of informant codes is proper under Exemption 2.[12]

The use of the exemption to delete symbols designating law enforcement techniques is a more difficult question, however. While in some situations such symbols may have merely internal significance, in this case there is a countervailing public interest in knowing how the FBI conducted its investigation. The gravamen of plaintiffs' complaint is that the FBI used illegal and unconstitutional methods in its investigation. Because there is a "genuine and significant public interest" in making sure that powerful agencies like the FBI use only permissible techniques in carrying out investigations, the *Rose* standard for the use of Exemption 2—that "the public could not reasonably be expected to have an interest" in the contents of such codes—is not satisfied. *Rose,* 425 U.S. at 369–70, 96 S.Ct. at 1603. Symbols designating investigatory techniques therefore do not fall within the scope of Exemption 2.[13]

### D. EXEMPTION 7: INFORMATION IN LAW ENFORCEMENT FILES

#### 1. *The Exemption 7 Threshold*

By far, the most frequently used exemption in the sample documents is that for

hood that it has been invoked elsewhere in documents not before the Court to delete informant codes. Therefore, the Court feels it necessary to discuss this application also.

**12.** The Court notes that the informant symbol number codes would also be redactible under Exemption 7(D).

information contained in law enforcement files. Under Exemption 7, documents may be withheld from disclosure if they are

> investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would ... (C) constitute an unwarranted invasion of personal privacy, (D) disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source, [and] (E) disclose investigative techniques and procedures....

§ 552(b)(7)(C)–(E).

■ The threshold question that must be addressed under this exemption is whether the documents at issue are "investigatory records compiled for law enforcement purposes." Courts have construed this requirement liberally. For example, the Ninth Circuit has held that law enforcement agencies such as the FBI should be accorded special deference in an Exemption 7 threshold determination. *Binion v. United States Dep't of Justice,* 695 F.2d 1189, 1193 (9th Cir.1983). Consequently, in order to satisfy this threshold, an agency with a clear law enforcement mandate such as the FBI need only establish a "rational nexus" between its law enforcement duties and the document for which Exemption 7 is claimed. *Id.* at 1193–94; *Scientology I,* 611 F.2d at 748.

In the case at bench, the FBI submits several affidavits stating that the documents involved in this case were compiled

**13.** This holding does not necessarily mean than all such codes must be disclosed, for the Act specifically includes a different exemption pertaining to these techniques—Exemption 7(E). However, it does mean that in order for such symbols to be withheld the government must satisfy the narrower 7(E) standards set out *infra,* Part D.4.

in connection with an internal security investigation to determine whether Wilkinson and NCARL were acting in violation of 18 U.S.C. §§ 2383 (rebellion or insurrection), 2384 (seditious conspiracy), 2385 (advocating the overthrow of the government), or 50 U.S.C. §§ 781–790 (Internal Security Act of 1950 & Communist Control Act of 1954). *See, e.g.,* Affidavit of David H. Cook, filed Aug. 23, 1985, pp. 9–13. The agency asserts that this investigation was an adjunct to its general investigation of the Communist Party of the United States and contends that there was a substantial basis to inquire into Wilkinson's connections with the Communist Party.[14]

Plaintiffs, on the other hand, hotly contest these assertions. They point to the fact that the investigation of Wilkinson continued for almost forty years without any charges ever being brought. Plaintiffs contend that even if the investigation had been legitimate in the beginning, its continuation for decades without the agency ever bringing charges against Wilkinson eventually vitiated any legitimate purpose.[15]

In addition, plaintiffs contend that the investigation of NCARL and Wilkinson employed illegal investigatory techniques, such as warrantless electronic surveillance and the infiltration and disruption of groups with which Wilkinson was involved. They allege that the use of these techniques, and hence the investigation itself, constituted unconstitutional interference with plaintiffs' rights under the First Amendment and contend that these circumstances indicate that the investigation was not conducted "for law enforcement purposes." Under this reasoning, Exemption 7 would not apply to the documents as a threshold matter; therefore, the information redacted thereunder would have to be disclosed.

The Court finds this to be a close question, especially in light of the paucity of hard documentary evidence on the issue of the purpose of the investigation. For the purposes of the Exemption 7 threshold, however, courts have held that an agency like the FBI "need only be held to a minimal showing that the activity which generated the documents was related to the agency's function." *Dunaway v. Webster,* 519 F.Supp. 1059, 1076 (N.D.Cal.1981). As long as the agency's basis for the "rational nexus" is not "pretextual or wholly unbelievable", a court "should be hesitant to second guess a law enforcement agency's decision to investigate if there is a plausible basis for its decision." *Pratt v. Webster,* 673 F.2d 408, 421 (D.C.Cir.1982). In view of this liberal standard, the Court holds that defendants have satisfied (albeit barely) their burden of showing, as an uncontroverted fact, that the Exemption 7 threshold has been met.[16]

Plaintiffs' argument regarding the length of the investigation and the ultimate deletion of Wilkinson's name from ADEX is unpersuasive. Simply because the agen-

---

**14.** In support of this contention, the government cites the Supreme Court's statement in *Wilkinson v. United States,* 365 U.S. 399, 412, 81 S.Ct. 567, 574, 5 L.Ed.2d 633 (1961), that "the subcommittee [of the House Committee on Un-American Activities] had reason to believe at the time it summoned [Wilkinson] that he was an active Communist leader engaged primarily in propaganda activities." Although this statement is dictum and hardly constitutes a finding of fact on this issue, in the absence of countervailing evidence it lends a modicum of support to the FBI's contention that it, too, "had reason to believe" that Wilkinson's alleged Communist ties warranted investigation.

**15.** Plaintiffs cite Ex. 44 to back up this contention. This document, dated Sep. 20, 1974, recommended Wilkinson's deletion from the agen-

cy's investigation list (ADEX) on the ground that the investigation indicated that "Wilkinson is not presently nor has he in the past been engaged in other materially pertinent, subversive activities that can be considered a threat to our national security." Ex. 44, at p. 2.

**16.** This holding is made for the limited purpose of ruling on whether the Exemption 7 threshold has been satisfied. However, because entirely different standards apply with respect to plaintiffs' remaining claims under the California and United States Constitutions, this holding does not in any way impinge on the merits of plaintiffs' other claims for relief. Nor does it decide the issue of whether information received from confidential sources is redactible under Exemption 7(D). *See infra,* Part D.3.

cy ultimately concluded that Wilkinson was not a national security threat does not indicate that the agency *never* had reason to investigate him. Indeed, many investigations that are unarguably legitimate still do not result in any indictment or conviction. *See Id.* ("Nor is it necessary for the investigation to lead to a criminal prosecution or other enforcement proceeding in order to satisfy the 'law enforcement purpose' criterion."). The FBI has a broad mandate to conduct internal security and criminal investigations. To hold that these investigations are necessarily improper unless they lead to an indictment would be charging the agency with the gift of prophecy.

Moreover, courts have held that Exemption 7 applies even to investigations of questionable legality. For example, in *Pratt*, the court was dealing with documents relating to a COINTELPRO investigation of the Black Panther Party that revealed "questionable actions by the FBI to foment distrust and suspicion and to create and enhance dissention" within the group. *Id.* at 422. Yet the court held that the Exemption 7 threshold was met and that the questionable investigatory techniques did not negate the law enforcement purpose of the investigation. The court emphasized that "[w]hile the methods frequently used by the FBI in its COINTELPRO activities offer a ready distinction from more typical means of law enforcement, FOIA Exemption 7 *refers to purposes rather than methods.*" *Id.* at 423 (emphasis in original).

In light of these considerations, the Court holds that there was enough of a law enforcement purpose to the investigation of plaintiffs to meet the liberal Exemption 7 threshold. This holding is based on the uncontroverted evidence of the existence of a legitimate law enforcement purpose of the investigation. Therefore, the FBI has made the requisite *prima facie* showing to satisfy the Exemption 7 threshold. This showing has not been rebutted or controverted.[17]

### 2. *Exemption 7(C): Invasion of Privacy*

Exemption 7(C) permits the deletion of the identities of persons mentioned in law enforcement files if disclosure would "constitute an unwarranted invasion of personal privacy." § 552(b)(7)(C). In judging an Exemption 7(C) claim, courts have uniformly held that the district court must conduct a *de novo* review, balancing the degree of the invasion of personal privacy against the public interest in disclosure.[18] *Van Bourg*, 751 F.2d at 985; *Lesar*, 636 F.2d at 486. As with all exemptions under FOIA, the agency bears the burden of proof on the balancing issue. § 552(a)(4)(B).

Here, the FBI has asserted Exemption 7(C) with respect to the names of FBI agents, clerical personnel, non-federal law enforcement officials, and third parties mentioned in the files. Because this exemption requires that the court balance the privacy interests of the persons mentioned in the files with the public interest in disclosure, specific, detailed *Vaughn* affidavits are especially critical:

> [T]he government may not rely on "conclusory and generalized allegations of exemptions" ... which preclude adversarial testing of the exemption claim and place the burden of wading through the documents on the court. Rather, it must present sufficient evidence to enable the court to make an independent assessment of the exemption claims.

*Powell*, 584 F.Supp. at 1512 (citation omitted).

---

**17.** This holding does *not* automatically entitle the FBI to wholesale redactions on the basis of this exemption, however. In order to delete information based on Exemption 7, the government must still meet its burden of showing that the other requirements for the specific 7(C), 7(D) and 7(E) exemptions have been met.

**18.** In *Rose*, 425 U.S. at 372, 96 S.Ct. at 1604, the court affirmed the use of this balancing test under Exemption 6, § 552(b)(6), and courts have "uniformly applied the same principle when reviewing claims under Exemption 7(C)." *Powell*, 584 F.Supp. at 1522. *See, e.g., Van Bourg*, 751 F.2d at 985.

Because the affidavits submitted by the government in this case are deficient in this regard, the government must disclose the information redacted under Exemption 7(C), unless it submits a more detailed, non-conclusory affidavit justifying the deletions on a document-by-document basis.[19]

### (a) *Names of FBI Personnel*

Courts have consistently recognized that FBI agents and other lower echelon governmental personnel have a significant privacy interest in non-disclosure of their names. Consequently, deletion of such names under Exemption 7(C) has usually been upheld. *Lesar,* 636 F.2d at 487; *Powell,* 584 F.Supp. at 1525; *Dunaway,* 519 F.Supp. at 1076–77. These decisions generally rest on the recognition that such personnel have a privacy interest in avoiding harassment and annoyance in their official and private lives and that the public interest in the disclosure of such names is usually minimal. Therefore, the Court will likely permit the redaction of the names of lower echelon federal and state personnel under Exemption 7(C).

However, the outcome of the balancing test may be different with respect to supervisory personnel. Several decisions upholding redactions under 7(C) have nevertheless implied that where there was misconduct or illegal behavior, such behavior might generate a sufficient public interest to override the privacy interests of the agents. *See, e.g., Lesar,* 636 F.2d at 486–87; *Ramo,* 487 F.Supp. at 132–33. Some decisions have gone even further. *E.g., Dunaway,* 519 F.Supp. at 1077 (persons who choose to serve as public officials may have given up a right to privacy if they engage in misconduct or questionable activities). *See also, Castaneda v. United States,* 757 F.2d 1010, 1012 (9th Cir.1985) (holding, in a case involving a food stamp investigation, that "[w]here it appears that the motives or truthfulness of the investigator are in doubt, the public need for supervision and disclosure is necessarily heightened").

Although no specific evidence of misconduct has yet been presented to the Court, the Court agrees with the above cases that the balancing process may come out in favor of disclosure if it appears that the agents supervising the investigation were engaging in misconduct. Any further government affidavits should therefore address this issue.

### (b) *Third Parties Mentioned in the Files*

The FBI has also redacted information in the files pertaining to third parties interviewed by the FBI and incidentally mentioned in the files. As is the case generally with the FBI's assertions of Exemption 7(C), the affidavit submitted by the government does not set forth sufficient specific facts to enable the Court to engage in a meaningful *de novo* balancing under Exemption 7(C).

First, the agency fails to address the fact that many of the documents at issue are between 20 and 40 years old. Any balancing process must necessarily address the age of the documents and the extent to which the privacy interests of those mentioned in the files may have diminished with time. *Powell,* 584 F.Supp. at 1526–28. In documents of this age it is reasonable to assume that at least some of the agents and third parties mentioned in the files have died or retired, thereby mooting or decreasing their privacy interests. Moreover, it is quite possible that "memories and hostile feelings, if any, have waned. There is likely to be little fear of retaliation, humiliation or embarrassment over twenty years after the events." *Id.* at 1526.[20]

---

**19.** The same criticism obtains with respect to the affidavits supporting the agency's use of the 7(D) and 7(E) exemptions, as is discussed *infra.*

**20.** In addition to the names of third parties, the FBI has also deleted peripheral information which it contends could theoretically identify

these individuals. In view of the passage of time and the fading of the events in question from recent memory, it is likely that the danger of identification has decreased significantly. *See Powell,* 584 F.Supp. at 1527. Consequently, unless the government can show a specific valid

Although it is true that the age of the documents alone will not justify the conclusion that there are no retained or residual privacy interests and it is similarly true that age may also diminish the public interest in disclosure of the names of agents and third parties, "a blanket assertion of privacy involving records over 20 years old is impermissible." [21] *Id.* Thus, any further government affidavits must supply the Court with sufficient detailed information to permit a meaningful balancing of the interests at issue.

In addition, the agency will have difficulty arguing that Exemption 7(C) permits redaction of the names and identifying information of Wilkinson, the named plaintiffs, and active members of NCARL. Any privacy interests in these names would be the various plaintiffs' to assert, and by bringing this suit they can be assumed to have waived such a right. Therefore, the names of plaintiffs and active members of NCARL should be disclosed, absent a persuasive showing by the government justifying withholding (or objection by plaintiffs or the plaintiff class).

Finally, many of the sample documents are reports of *public* meetings and rallies at which speeches were given. In order to withhold the names of the speakers and the synopses of the speeches under Exemption 7(C), the government will have to make a persuasive showing of why the privacy interests involved outweigh the public interest in disclosure. These were public events and such speakers can be assumed to have known that public attention would necessarily be directed toward them by their active participation in such events. Such participation in public forums unquestionably decreases their privacy interest in the withholding of such information.

Because the application of Exemption 7(C) depends upon the balancing of so many individual factors, the government may not rely upon presumptions and blanket assertions stating simply, in a conclusory fashion, that the information should be deleted for privacy reasons. Unless the government can submit an affidavit specifically addressing the above factors in the context of each document, the Court will be forced to conclude that the agency has failed to meet its burden of proof with respect to Exemption 7(C).

### 3. Exemption 7(D): Confidential Sources

Of all the exemptions relied upon by the government, by far the greatest number of deletions are made under Exemption 7(D). This exemption really consists of two separate exemptions. *See, e.g., Dunaway,* 519 F.Supp. at 1080. First, it protects information from records "compiled for law enforcement purposes" if they would "disclose the *identity* of a confidential source." § 552(b)(7)(D) (emphasis added). In addition, the exemption protects "confidential *information* furnished *only* by a confidential source" if the information is contained in a record "compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a *lawful* national security intelligence investigation." *Id.* (emphasis add-

---

privacy interest in such peripheral information, it will be disclosed.

**21.** For example, with respect to Ex. 12, the government asserts that the "FBI is not required by the FOIA to conduct a time consuming, costly, and possibly fruitless investigation *de novo* to determine if in fact a person is still alive. Therefore, unless noted or otherwise known, all persons are considered to be a living person and are provided with the appropriate privacy and/or confidentiality."

This statement is typical of the conclusory nature of the government's affidavit. It ignores the fact that FOIA specifically places on the agency the burden of proof with respect to each deletion of information in each document. § 552(a)(4)(B). In view of the policies of narrow construction of the exemptions and *de novo* review by the district court, reliance on such a self-serving presumption is impermissible. While the government does not have to verify the status of each name in every document, it does have to engage in a meaningful review of the effect of age on the privacy interests involved with respect to each document. If the government views this requirement of FOIA as too burdensome, it may simply release the information.

ed). Each of these subparts will be dealt with in turn.

### (a) *Confidentiality*

■ In order to qualify under either part of Exemption 7(D), the deletion must involve a "confidential source." [22] This requires that the government's affidavit show that the source was given either an express or implied assurance of confidentiality. *Van Bourg*, 751 F.2d at 986. In order for such an assurance to be implied, the source must have provided information "in circumstances from which such an assurance could be reasonably inferred." Conf.Rep. No. 93–1200, *reprinted in* 1974 U.S.Code Cong. & Adm.News 6267, 6285, 6291. *See Powell*, 584 F.Supp. at 1528.

Some cases have held that in order to protect the flow of information to the FBI, all persons interviewed by the agency receive, in whatever circumstances, an implied assurance of confidentiality. *See, e.g., Ingle v. Dep't of Justice*, 698 F.2d 259, 269 (6th Cir.1983). However, the Court agrees with the other line of cases which holds that this blanket approach is inconsistent with the requirement that the court engage in *de novo* review. *See, e.g., Powell*, 584 F.Supp. at 1528–29. People are interviewed by the FBI in all kinds of circumstances, some confidential and others not, and it is consistent with the Act's emphasis on disclosure and *de novo* review to look at each circumstance separately.

For example, where a source is interviewed by the FBI about a criminal suspect in an ongoing investigation, it may be reasonable to infer, absent evidence in the documents to the contrary, that such a source would assume confidentiality. *Id.* In such cases, one could assume that "the source would hardly have supplied the information unless it were confident that its identity would remain concealed." *Iglesias v. CIA*, 525 F.Supp. 547, 564 (D.D.C.1981), *citing, Pope v. United States*, 599 F.2d 1383, 1386 (5th Cir.1979). Therefore, in

interviews of this nature, the FBI will have less of a burden to show implied confidentiality.

However, an entirely different situation is presented where a person is interviewed with the knowledge that he may be called to testify as a witness in a public trial or where the person is being interviewed only about general background issues that would not generally trigger a desire for confidentiality. *See, e.g., Powell*, 584 F.Supp. at 1529. In such cases, the government must justify in its affidavit the circumstances from which confidentiality may be implied. In the present affidavit of David H. Cook, filed Oct. 15, 1985, the government has failed to address this issue.

### (b) *Identity of the Source*

■ Once it is apparent that the record involves a confidential source and has met the Exemption 7 threshold, the name of the source and information tending to disclose its identity may be deleted from the document. However, this does not entitle the government to make blanket redactions upon this basis. Only the source's name and that information with a realistic likelihood of disclosing the source's identity may be redacted. As always, the government bears the burden of proof on this issue. § 552(a)(4)(B). Documents like Exhibits 17A or 19, in which the government states that the information contained within is known *only* to the source, present the easiest situation. If supported by a sufficient showing in the affidavit, redactions of such information will usually be permitted.

However, with respect to the majority of the exhibits at issue, the affidavit is sorely inadequate in providing justification for the extensive redactions. For example, where the document concerns the events at a public meeting (*e.g.*, Ex. 2–5, 7–9), the synopsis of public speeches (*e.g.*, Ex. 4, 7, 11) or the contents of a publicly circulated petition (*e.g.*, Ex. 3), the government will be hard-

---

**22.** Such a source can include not only informants and other persons interviewed by the FBI, but also other state, federal and local law enforcement agencies. *Church of Scientology v. United States Dep't of Justice*, 612 F.2d 417, 426–27 (9th Cir.1979).

pressed to argue that the entire document should be redacted on the grounds that it will identify the source. Public events and petitions by their very nature involve numerous people having equal access to the information. This fact rebuts the government's presumption that disclosure of such public information would necessarily identify the informant.

The FBI's redactions also require additional justification when they involve events contained in 20–40 year-old documents. While there may have been a danger of identifying the informant when the events were recent, that danger clearly fades as the documents become decades old. Therefore, the government will have to justify redacting more than the source's name with a specific showing of how the remaining information would identify the source.

### (c) *Information Supplied by the Source*

The second major part of Exemption 7(D) is that for information provided solely by the confidential source. The government cites this exemption as a justification for wholly redacting the majority of the exhibits at issue, especially those documents that were formerly completely redacted pursuant to Exemption 1 before they were declassified. In order for this exemption to apply, however, the government must satisfy two requirements: (1) the information must have been provided *only* by the confidential source; and (2) it must have been compiled in the course of a lawful investigation. § 552(b)(7)(D).

With respect to the first point, with only two or three exceptions, there is absolutely no evidence in the government's affidavit that the information deleted came only from the confidential source involved. Especially where the information is generally known, or is present in several different documents derived from different sources, the government must make a specific showing in its affidavit as to why this part

of the exemption has been satisfied. In its present affidavit, it simply has failed to do so.

With respect to the second requirement, that the investigation be lawful, courts have held that the statutory language imposes a much stricter burden on the government than the general Exemption 7 threshold requirement. *Powell*, 584 F.Supp. at 1530; *Dunaway*, 519 F.Supp. at 1080. Whereas Congress provided that Exemption 7 in general is applicable to records compiled "for law enforcement purposes," it specifically imposed the additional requirement that *information* supplied by such sources may only be exempted from disclosure if it was obtained in the course of a lawful investigation. § 552(B)(7)(D). Unless this language simply is to be disregarded, the only reasonable conclusion to be drawn is that Congress intended to provide broader protection for the identity of confidential sources than for the information they provided.[23] Therefore, even if certain records can pass the liberal "rational nexus" test, they still may not pass the requirement for the deletion of confidential information. *Powell*, 584 F.Supp. at 1530.

In *Dunaway*, which also dealt with an investigation of suspected leftists under the statutes at issue here, the court held that the 7(D) requirement had not been met:

> [T]he government has not presented any evidence, other than to cite us to some of … the statutes under which these investigations allegedly proceeded, of the basis for the investigations, or even as to the internal procedures by which these investigations were initially approved and kept open for many years…. [M]uch of the material seemed to be the result of general information gathering and monitoring of activities which cannot be related to the good faith enforcement

---

**23.** This conclusion is reinforced by the additional requirement in FOIA (discussed above) that

the information be supplied *only* by the source.

of the statutes cited as the basis [for the investigation].

*Dunaway,* 519 F.Supp. at 1080.

In the case at bench, many of the same concerns are evident. Not only did the investigation of plaintiffs continue for over 40 years without any uncovering of violations of the statutes cited, but the government's affidavit, conclusory as it is, indicates that most of the investigatory documents involved surveillance of public meetings and rallies, synopses of the speeches given at those events, transmittal to the FBI of public petitions and flyers and reports of plaintiff Wilkinson's movements around the country in furtherance of NCARL's lobbying activities. When coupled with the allegations of misconduct in plaintiffs' complaint, these facts undermine the government's contention that the investigation was legitimate for the purposes of Exemption 7(D).[24]

Although the Court has held that the evidence before it is sufficient to meet the Exemption 7 "rational nexus" threshold test, it is *not* sufficient to meet the stricter requirement pertaining to the deletion of information supplied by confidential sources. Because the government's present affidavit provides virtually no evidence on this issue, the Court will be forced to conclude that the government cannot meet its burden of proof on this issue unless the FBI can provide a further affidavit adequately addressing this question.

### 4. *Exemption 7(E): Investigatory Techniques*

Although this exemption arguably is asserted only once in the sample documents, because it may be more commonly used in the 12,000 documents not presently before the Court, it is necessary to set out a few

guidelines for its use. This exemption permits the deletion, in records compiled for law enforcement purposes, of information that will "disclose investigative techniques and procedures" of the agency. § 552(b)(7)(E).

The rationale behind this exemption is that investigatory agencies should not have to disclose their *modus operandi,* as such disclosure might enable potential violators to become familiarized with, and hence to circumvent, effective law enforcement procedures. 15 *Fed.Proc.L.Ed.* § 38:137 (1983). Because this policy would not apply where the techniques are widely known, however, the courts uniformly hold that this exemption is applicable only to techniques and procedures not generally known to the public. *Dunaway,* 519 F.Supp. at 1082–83; *Malloy v. United States Dep't of Justice,* 457 F.Supp. 543 (D.D.C.1978).[25]

In order to justify a deletion under Exemption 7(E), the government will have the burden of proving that these techniques are not generally known to the public.

■ In addition, in view of plaintiffs' allegations that the agency used illegal techniques in their investigation and disrupted plaintiffs' exercise of their First Amendment rights, the Court will carefully examine any deletions under 7(E). Because the policy behind this exemption is to shield effective and little-known law enforcement techniques from potential violators so that they may not be circumvented, Exemption 7(E) may not be used to withhold information regarding investigative techniques that are illegal or of questionable legality. The agency can have no valid interest in preventing the public from dis-

---

**24.** Many of the questionable and outright illegal means and methods employed by the FBI in its COINTEL Program were detailed before the so-called Church Committee. *See generally,* 6 *Hearings Before the Select Committee to Study Governmental Operations With Respect to Intelligence Activities of the United States Senate,* 94th Cong., 1st Sess. (1975).

**25.** For example, techniques such as the use of fingerprints (*Ferguson v. Kelley,* 448 F.Supp. 919, 926 (N.D.Ill.1977)), ballistics tests (Conf. Rep. No. 93–1200, *reprinted in,* 1974 U.S.Code Cong. & Adm.News, 6285, 6291), mail covers and the use of post office boxes (*Dunaway,* 519 F.Supp. at 1083) would not fall within this exemption. However, the exact procedures and techniques regarding the use of bait money would. *Malloy,* 457 F.Supp. at 545.

covering such techniques—indeed, there is a strong countervailing public interest in exposing such methods to public scrutiny, and in ensuring that agencies do not abuse their police power. Therefore, Exemption 7(E) does not permit redactions of improper law enforcement techniques.

### E. SEGREGABILITY

■ Immediately after listing the nine exemptions to the general policy of disclosure, FOIA provides that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." § 552(b). Because the focus of FOIA "is information, not documents, ... the agency cannot justify withholding an entire document simply by showing that it contains some exempt material." *Willamette Indus., Inc. v. United States*, 689 F.2d 865, 867 (9th Cir.1982). Instead, " 'non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions' such that the excision of exempt information would impose significant costs on the agency and produce an edited document with little informational value." *Id.* at 867–68, *citing, Mead Data Cent. Inc. v. United States Dep't of the Air Force*, 566 F.2d 242, 260–61 (D.C. Cir.1977).

■ As is true with the exemptions, the agency bears the burden of showing in a non-conclusory affidavit that the information is not reasonably segregable. *Willamette Indus.*, 689 F.2d at 868. While agencies need not provide such a detailed justification that the secrecy of exempt material would be compromised, an agency should "describe what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document. Armed with such a description, both litigants and judges will

be better positioned to test the validity of the agency's claim that the non-exempt material is not segregable." *Mead Data Cent.*, 566 F.2d at 261.

In the case at bench, the government has *completely* redacted approximately 120 of the 140 pages of sample documents attached to its affidavit, and in justification of such widespread redactions, offers only three conclusory sentences pertaining to segregability.[26] There is not even the slightest effort to satisfy the *Willamette Indus.* and *Mead Data Cent.* standards with respect to each document. Nowhere does the government provide the Court with any facts regarding individual documents that would enable the Court to "test the validity of the agency's claim" *de novo.* In light of this total lack of evidence on this issue, unless the government can provide the Court with a further affidavit stating in detail the reasons why the information is not segregable, the Court will have no choice but to grant summary judgment to plaintiffs on this issue.

### CONCLUSION

■ In conclusion, a detailed review of the documents at issue and the government's *Vaughn* affidavit indicates that, except with respect to informant codes under Exemption 2, the FBI has not met its burden under FOIA of showing that its assertion of the various statutory exemptions is justified. The majority of the sample documents are completely blackened out and the government's justifications for the redactions tend to be conclusory statements that do not enable this Court meaningfully to assess the validity of the agency's claims of exemptions. As set out above, the government fails adequately to address such issues as the age of the documents, the legitimacy of the investigation with respect to Exemption 7(D), the factors enter-

---

**26.** *See* Affidavit of David H. Cook, filed Oct. 15, 1985, at ¶ 9 ("In all cases where the (b)(7)(C) exemption was applied, if the identifying information about such an individual was segregable ... [it] was furnished to plaintiffs."); ¶ 25 ("As has been stated earlier, wherever information

received from a source would not identify the source, that information has been left in the document and furnished to plaintiffs."); and ¶ 33 ("There are no reasonably segregable portions of the withheld material which can be released.").

ing into the Exemption 7(C) balancing test, the segregability of the non-exempt information within the documents, the nature of the information that might identify sources and third parties and whether the law enforcement techniques redacted are commonly known and properly used.

Because *in camera* review is not to be used as a substitute for a specific, non-conclusory *Vaughn* affidavit, the Court declines to make a comprehensive *in camera* review of the redactions at this time. The material before the Court is simply too voluminous, and the affidavit is too conclusory, to make *in camera* review productive. However, instead of ordering immediate disclosure, the government will be given one more opportunity to submit a specific affidavit addressing the concerns articulated in this opinion.[27] If the government submits no such affidavit within 30 days, the Court will be forced to conclude that the FBI cannot meet its burden of proof with respect to the redacted material and it will be disclosed to plaintiffs. Any further affidavit submitted by the agency must address the defects pointed out in this opinion and must make a clear showing of why any redactions still asserted meet the standards set forth herein.

The cross-motions for summary judgment shall be resubmitted for decision 30 days from this date. The Court also will consider at that time, after review of any further affidavits, whether or not *in camera* review is appropriate.

---

**27.** The Court on other occasions in the past has afforded the agency a similar opportunity to submit supplemental affidavits. *See, e.g., Dames & Moore,* 544 F.Supp. at 96.